**In re the Matter of the Involuntary Termination of the Parent–Child Relationship of T.F. and E.F., Minor Children, and their Mother, Katherine Ferbert, and their Father, Monty Ferbert.**

**Katherine Ferbert and Monty Ferbert, Appellants–Respondents,**

**v.**

**Marion County Office of Family and Children, Appellee–Petitioner.**

**No. 49A02–0008–JV–487.**

Court of Appeals of Indiana.

Feb. 5, 2001.

---

Mark Small, Janice L. Stevens, Indianapolis, IN, Attorneys for Appellants.

Tonja V. Kinder, Loretta A. Oleksy, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants–Respondents, Monty Ferbert (Monty) and Katherine Ferbert (Katherine) (hereinafter referred to collectively as "Ferberts"), appeal the trial court's involuntary termination of their parental relationship with their natural children, T.F. and E.F.

We affirm.

### ISSUES [1]

The Ferberts raise three issues for our review, which we consolidate and restate as follows:

---

1. Although Monty and Katherine filed separate briefs in this matter raising slightly different arguments, in this opinion we have consolidated the issues they raise.

1. Whether the Ferberts' due process rights were violated because they were not provided with a case plan concerning their children during the CHINS proceedings, resulting in a deprivation of procedural due process rights in the termination proceedings.

2. Whether there was sufficient evidence to support the involuntary termination of the Ferberts' parental rights under Ind.Code § 31–35–2–4(b)(2).

## FACTS AND PROCEDURAL HISTORY

Katherine and Monty Ferbert are the biological parents of E.F., born March 19, 1997, and T.F., born January 31, 1994. On March 19, 1997, the Ferberts came to the attention of the Marion County Office of Family and Children (MCOFC) when Monty broke a sleep apnea monitor and called the police because E.F. was having trouble breathing. Neglect was substantiated at this time, however, the children were allowed to remain with the Ferberts, and they entered into a Services Referral Agreement with the MCOFC.

On October 4, 1997, the children were removed from the Ferberts' home because Monty struck E.F. in the mouth with a closed fist, threw the baby down, and struck him again. The Indianapolis Police Department was called, and the police arrived at the home to find the house in total disarray and unclean. Based upon the statement of several witnesses on the scene, Monty was arrested and charged with two counts of battery, three counts of neglect of a dependent,[2] and criminal recklessness. Monty pleaded guilty to battery, and was placed on probation. A criminal no contact order with his children was a condition of his probation.

As a result of Monty beating E.F., the criminal neglect of the children, the Ferberts' inability to properly care for the children, the uncleanliness of their home,

their failure to meet the requirements of the Services Referral Agreement, and their denial of the beating of E.F., a CHINS petition was filed on October 9, 1997. Following a trial on January 20, 1998, T.F. and E.F. were found to be CHINS and the trial court proceeded to disposition on February 24, 1998, placing T.F. and E.F. in foster care pursuant to the dispositional decree.

As a result of the CHINS proceedings, the Ferberts were provided a Participation Decree, outlining several services they were required to complete in order to attain reunification with their children. However, several Case Managers assigned to the case testified that Katherine refused to separate from Monty in light of the no contact order, their home remained filthy and unsafe for the children, and the Ferberts failed to complete the services required of them. Therefore, on September 8, 1998, the MCOFC filed a petition to involuntarily terminate the Ferberts' parental rights to their children. Evidence was heard on January 10, 2000, January 27, 2000, and April 7, 2000. On April 24, 2000, the trial court issued its Order Terminating the Parent–Child Relationship. Additional facts will be supplied when necessary.

The Ferberts now appeal.

## DISCUSSION & DECISION
### I. *Procedural Due Process*

First, the Ferberts argue that the MCOFC failed to provide them with a case plan for their children following the CHINS determination. Specifically, the Ferberts contend that procedural irregularities in the CHINS proceedings deprived them of their procedural due process rights in the termination proceedings.

Indiana Code Chapter 31–34–15 governs case plans in CHINS proceedings. Specifically, Ind.Code § 31–34–15–1 provides

---

**2.** At the time of this incident, the Ferberts' third biological child, E.F.'s twin, lived in the home, but later died in foster care.

that "a case plan is required for each child in need of services who is under the supervision of the county ...", while section 31–34–15–2 states that "[t]he county office of family and children, after negotiating with the child's parent, guardian, or custodian, shall complete a child's case plan not later than sixty (60) days after the date of the child's first placement, or the date of a dispositional decree, whichever comes first." Further, Ind.Code § 31–34–15–3 states that "[a] copy of the completed case plan shall be sent to the child's parent, guardian, or custodian not later than ten (10) days after the plan's completion." Finally, Ind.Code § 31–34–15–4 provides in relevant part that "[t]he case plan must include a description and discussion of ... [a] permanent plan for the child and an estimated date for achieving the goal of the plan, [and][t]he appropriate placement for the child based on the child's special needs and best interests."

Specifically, the Ferberts claim that the MCOFC's failure to provide them with a case plan following the CHINS determination, to delineate a permanent plan for their children and an estimated date for achieving the goal of the plan, was a procedural irregularity of the CHINS proceedings, nullifying the CHINS determination, and thereby rendering the termination determination void. We disagree.

■ The involuntary termination of parental rights is an extreme measure that is designed to be used only as a last resort when all other reasonable efforts have failed. *In re B.D.J.*, 728 N.E.2d 195, 199 (Ind.Ct.App.2000). Choices about marriage, family life, and the upbringing of children are among associational rights the United States Supreme Court has ranked as of basic importance in our society and are rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect. *M.L.B. v. S.L.J.*, 519 U.S. 102, 116–17, 117

S.Ct. 555, 564, 136 L.Ed.2d 473 (1996). A case involving the State's authority to permanently sever a parent-child bond demands the close consideration the Supreme Court has long required when a family association so undeniably important is at stake. *Id.*

■ The nature of the process due in parental rights termination proceedings turns on a balancing of the "three distinct factors" specified in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976): the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure. *Santosky v. Kramer*, 455 U.S. 745, 754, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982). Finally, we must keep in mind the general proposition that if the State imparts a due process right, then it must give that right. *City of Mitchell v. Graves*, 612 N.E.2d 149, 152 (Ind.Ct.App.1993).

The Ferberts argue that because the MCOFC violated their due process rights by failing to follow the statutory procedures of a CHINS proceeding, the trial court's termination determination is void. The Ferberts rest their argument on our holding in *A.P. v. Porter County Office of Family and Children*, 734 N.E.2d 1107, 1112–1113 (Ind.Ct.App.2000), *reh'g denied*, that "procedural irregularities in a CHINS proceedings may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *Id.* at 1113.

In that case, we reasoned that the CHINS and involuntary termination statutes are not independent of each other, and in fact, Ind.Code § 31–35–2–2 [3] clearly states that an involuntary termination proceeding is "governed by the procedures prescribed by" the CHINS statutes contained in Indiana Code Article 31–34. *Id.*

---

**3.** Ind.Code § 31–35–2–2 is the statute that provides for the law governing proceedings for the termination of the parent-child rela-

tionship involving a delinquent child or a child in need of services.

at 1112. However, we also found that although termination proceedings are governed by the CHINS statutes, Ind.Code § 31–35–2–2 clearly states that termination proceedings are distinct from CHINS proceedings. *Id.* Moreover, we stated that:

> Our supreme court has concluded that CHINS proceedings are 'distinct from' involuntary termination proceedings in that a CHINS cause of action is separate from and does not necessarily lead to a termination cause of action. *State ex rel. Gosnell v. Cass Cir. Court,* 577 N.E.2d 957, 958 (Ind.1991). Moreover, a CHINS intervention in no way challenges the general competency of a parent to continue a relationship with his or her child, and a termination proceeding is thus of 'much greater magnitude as to the rights of the parties involved.' *Id.* Also, an involuntary termination of parental rights can occur only after a child has been removed from his or her parent for six months under a CHINS (or juvenile delinquency) dispositional decree, or after a court has made an express determination that reasonable efforts for family preservation or reunification are not required pursuant to Indiana Code Section 31–34–21–5.6, or after the child has been removed from his or her parent for at least fifteen of the most recent twenty-two months. I.C. § 31–35–2–4.

*Id.*

■ Therefore, although termination proceedings and CHINS proceedings have an interlocking statutory scheme because involuntary termination proceedings are governed by the CHINS statutory procedures, CHINS proceedings are separate and distinct from involuntary termination proceedings because a CHINS cause of action does not necessarily lead to an involuntary termination cause of action. However, in order for an involuntary termination determination to be made, it is necessary that the statutory CHINS procedures have been properly followed. Thus, in *A.P.* we held that:

> Those three alternative prerequisites to involuntary parental rights termination can only be met through compliance with the CHINS or juvenile delinquency statutes. . . . It would be incongruous to hold that a county, with the assistance of a juvenile court, may commence CHINS proceedings for a child and remove a child from his or her home, yet disregard various portions of the CHINS and termination statutes on *several occasions* and still terminate parental rights following the passage of time after a CHINS dispositional decree and a child's removal from the home.

*Id.* at 1112–1113 (emphasis supplied).

Nevertheless, we find the facts of that case distinguishable from the case at hand. First, in *A.P.,* although no case plans were made part of the court's record prior to the termination hearing, the appellate record contained nine case plans. *Id.* at 1113. However, in our case, the record does not contain a case plan, thus the record does not reflect whether a case plan was ever prepared *or* whether the Ferberts·were ever provided with a copy of a case plan. Therefore, in *A.P.* we had the opportunity to analyze the case plan concurrently with the original dispositional order and the multiple review hearing orders to determine whether the parents were properly notified of their right to know what conduct could lead to the termination of their parental rights. In fact, in *A.P.* we found that the original dispositional order and the multiple review hearing orders provided some written notice to the parents, however, the case plans often contained requirements not contained in the court orders. *Id.* at 1114. Therefore, in *A.P.* we held that the difference in requirements between the case plans and the court orders heightened the importance of providing copies of case plans to the parents. *Id.*

Next, in *A.P.* we analyzed at least seven clear and substantial procedural irregulari-

ties including the fact that the Office of Family and Children admittedly failed to provide the parents with copies of the case plans as required by Ind.Code § 31–34–15. Moreover, after analyzing each procedural irregularity and its effect, we specifically noted that:

> we are not convinced that any one of the above irregularities by itself substantially increased the risk of error in the termination proceeding to the extent that appellants were deprived of due process, there is such an inherent risk of error because of the multiplicity of procedural irregularities.

*Id.* at 1118. Therefore, unlike the case at hand, in *A.P.* we analyzed "a record replete with procedural irregularities throughout CHINS and termination proceedings that are plain, numerous, and substantial," *Id.* at 1118, thereby reversing a termination judgment as a result of procedural due process errors.

Finally, in holding that the multiplicity of clear and substantial procedural errors relating to the CHINS and termination proceedings deprived the parents of their due process rights in *A.P.*, we specifically noted that "we are not adding an additional element to those that an agency seeking to terminate parental rights must prove by clear and convincing evidence" as exclusively set forth in Ind.Code § 31–35–2–4. *Id.* Although the record here fails to afford us with evidence of whether the MCOFC or the trial court failed to follow statutory mandates to provide the Ferberts with a case plan, we do not wish to add an element of providing a case plan to those that an agency must prove by clear and convincing evidence under Ind.Code § 31–35–2–4 in order to terminate parental rights.

Therefore, unlike *A.P.*, in the case at hand, there was no case plan contained in the record for us to analyze concurrently with court orders to determine whether a difference in requirements existed to deprive the Ferberts of their due process right of notice as to what conduct on their part could lead to the termination of their parental rights.

But, the record is replete with evidence that the Ferberts were provided with notice of what conduct could lead to a termination of their parental rights. Moreover, in our case, the record did not contain a multitude of procedural errors to compel us to reverse the trial court's termination determination. In fact, in *A.P.* we specifically noted that we were not convinced that any one irregularity created a substantial risk of error in the termination proceeding to deprive the appellants of their due process rights. Therefore, this court's holding in *A.P.* does not stand for the proposition that one procedural irregularity in and of itself, without a multitude of other clear and substantial procedural irregularities, is enough to deprive a parent of his due process rights, resulting in a reversal of the termination determination.

Specifically, the record indicates that following the CHINS determination, the Ferberts were provided with a Predispositional Report (R. 464) and a Parental Participation Decree (R. 466, 467) that outlined the requirements the Ferberts needed to complete that would allow their children to be returned to them. However, following a Dispositional Hearing and a Placement Review Hearing, the trial court determined that reasonable services were offered and made available to the Ferberts to prevent or eliminate the need for removal of their children, but such services were either not effective or not completed to allow the children to be returned home. Thus, the trial court ordered the children to be wards of the MCOFC and terminated the Ferberts' parental rights.

■ Therefore, because proof of a case plan is not an element enunciated in the termination proceedings under Ind.Code § 31–35–2–4, the record of the CHINS proceedings is not before this court in order for us to examine whether a case plan was prepared and provided to the Ferberts. The record in this case does not

reflect a multitude of procedural irregularities but only an allegation of one procedural error, and the record indicates that the Ferberts were given adequate notice of what conduct on their part could lead to their children being returned to them. The Ferberts have failed to establish that a procedural irregularity has deprived them of their due process rights.

## II. *Sufficient Evidence for Involuntary Termination*

In reviewing termination proceedings on appeal, this court will not reweigh the evidence nor assess the credibility of witnesses. *Egly v. Blackford County Dept. of Public Welfare,* 592 N.E.2d 1232, 1235 (Ind.1992). We consider only the evidence that supports the trial court's decision and the reasonable inferences drawn from that evidence. *Id.* In deference to the trial court's unique position to assess the evidence, we set aside the judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *Id.; see also Matter of Adoption of D.V.H.,* 604 N.E.2d 634, 637 (Ind.Ct. App.1992), *trans. denied.*

The involuntary termination of parental rights is the most extreme sanction a court can impose. *Matter of D.G.,* 702 N.E.2d 777, 780 (Ind.Ct.App.1998). Termination severs all rights of a parent to his or her children. *Id.* at 781. Therefore, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id.* This policy is in recognition of the constitutional rights of the parents to the custody of their children and the State's authority to interfere with this right only in certain limited circumstances. *Id.* The Fourteenth Amendment to the United States Constitution protects a parent's right to establish a home and raise his children, but these protected interests are not absolute and must be subordinated to the children's interest in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

The purpose of terminating parental rights is not to punish parents but to protect their children. *Matter of A.N.J.,* 690 N.E.2d 716, 720 (Ind.Ct.App. 1997). Although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parties are unable or unwilling to meet their responsibility as parents. *Id.* Parental rights are not absolute and must be subordinated to the child's interests when deciding whether to terminate parental rights pursuant to Ind.Code § 31–35–2–4(b)(2). Termination of parental rights is proper where the children's emotional and physical development is threatened. *Matter of A.M.,* 596 N.E.2d 236, 238 (Ind.Ct.App. 1992), *trans. denied.* The trial court need not wait until the children are irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *J.L.L. v. Madison County Dept. of Public Welfare,* 628 N.E.2d 1223, 1227 (Ind.Ct.App.1994).

To effect the involuntary termination of a parent-child relationship, the MCOFC must present clear and convincing evidence to establish the elements of Ind. Code § 31–35–2–4(b)(2):

(A) one (1) of the following exists:

(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(ii) a court has entered a finding under IC 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

(iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;

(B) there is a reasonable probability that:

  (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

  (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

### A. *Ind.Code § 31–35–2–4(b)(2)(B)*

The Ferberts argue that there is insufficient evidence to support the involuntary termination of their parental rights. The Ferberts contend that the State failed to prove by clear and convincing evidence that the conditions causing the removal of their children were not likely to be remedied or that the continuation of the parent-child relationship posed a threat to the children's well-being. Specifically, the Ferberts assert that the majority of the State's witnesses testified positively in their favor, or did not have an adequate basis to testify regarding the Ferberts' home condition or their interaction with their children. Essentially, the Ferberts invite us to reweigh the evidence and judge the credibility of the witnesses. This we will not do.

The trial court found that the parent-child relationship between the Ferberts and their children should be terminated; that the children were found to be CHINS; that the children had been removed from the Ferberts' home for at least six (6) months under a dispositional decree; there was a reasonable probability that the conditions that resulted in the removal of the children would not be remedied, that the reasons for continued placement of the children outside the Ferberts' home would not be remedied and that the continuation of the parent-child relationship poses a threat to the well being of the children; that termination of the parent-child rela-

tionship was in the best interests of the children; and the MCOFC has a satisfactory plan for the care and treatment of the children. (R. 16–17).

The Ferberts do not dispute that there was sufficient evidence to support the first and fourth elements for termination; that their children had been removed from them for at least six (6) months, and that there is a satisfactory plan for the care and treatment of T.F. and E.F. However, the Ferberts do dispute the sufficiency of the evidence for the two parts of the second element of the termination statute. Nevertheless, the termination statute requires the MCOFC to demonstrate a reasonable probability that either the conditions that resulted in the children's removal will not be remedied *or* that the condition of the parent-child relationship posed a threat to the children's well-being. The trial court specifically found that there was a reasonable probability that the conditions that resulted in the removal of T.F. and E.F. would not be remedied, and there is sufficient evidence in the record to support the trial court's conclusion. It was not necessary for the MCOFC to prove or for the trial court to find that the continuation of the parent-child relationship posed a threat to the children.

To determine whether the conditions are likely to be remedied, the trial court must judge a parent's fitness to care for the child as of the time of the termination hearing, taking into account any evidence of changed conditions. *Wardship of J.C. v. Allen County Office of Family and Children,* 646 N.E.2d 693, 694 (Ind.Ct. App.1995), *reh'g denied, trans. denied.* The court must also consider the parent's pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Id.*

Here, the evidence reveals that the Ferberts' most serious deficiencies in their ability to care for their children were: 1) their continued and consistent denial that

Monty was responsible for striking E.F., resulting in his arrest for two counts of battery, three counts of child neglect and criminal recklessness, 2) the unsafe and life endangering condition that Katherine placed on the children by continuing to cohabitate with Monty in light of a no contact order with the children, and 3) the uncleanliness of their home and their repeated failure to demonstrate a safe and clean home environment.

First, on October 4, 1997, the Indianapolis Police Department was called to the Ferberts' home. When the police arrived, they observed a six month old male infant bleeding from the mouth with noticeable swelling. The police noted that the home was in complete disarray and an endangerment to the children. Specifically, there were dirty dishes, bottles and trash scattered throughout the house, and the home had a distinct foul odor. Moreover, the police observed a three year old female with bruises and insect bites all over her body. After treatment at the hospital, the child was found to have body and head lice. The police further observed another six month old male infant in a bassinet unattended and exhibiting poor hygiene. The police interviewed several witnesses at the scene in reference to Monty striking E.F., stating that they observed Monty repeatedly cursing and striking the infant with a closed fist. Thereafter, Monty chased the witnesses down the street cursing and waving a knife. Monty was arrested at the scene for two counts of battery, three counts of child neglect, and criminal recklessness. On October 7, 1997, the Case Manager, Amy Goodwin, received a telephone call from Katherine, explaining that she was not at home when E.F. was struck, but that she would support her husband due to his mental instability.

At trial Monty did not accept responsibility or acknowledge that he struck E.F. In fact, even though he pleaded guilty to battering E.F., at trial Monty stated that a criminal gang had thrown a rock through the window injuring E.F. Moreover, at trial Katherine refused to believe that Monty struck E.F., and instead believed Monty's story. Therefore, the Ferberts' continued denial of Monty's responsibility for striking and endangering their children is evidence that they refuse to believe that Monty presents a danger and further risk to the children.

Next, Katherine acknowledged in her testimony that she was aware her children could not be returned to her home while she was cohabitating with Monty because of the no contact order, however, she continued to live with Monty. Moreover, although she stated that she would be willing to separate from Monty if the children were placed in her care, her pattern of conduct does not support her willingness to do so. Therefore, Katherine's pattern of conduct indicates that she is unwilling to refrain from living with Monty in light of a court ordered no contact order as a result of Monty's criminal battery of E.F.

Finally, the Ferberts have failed to demonstrate an ability to provide their children with a safe, clean home environment despite the trial court's Predispositional Report recommendation to "maintain safe, stable, and sanitary housing with functioning utilities and an appropriate supply of nutritious food for the children placed in her home by this Agency." (R. 464). However, the Ferberts' home remained cluttered and filthy for a period of thirteen (13) months despite constant prompting from the home based counselor. Moreover, in September of 1999, the home based counselor's progress report indicated that the Ferberts' had had plenty of time to clean their house, but their home was not acceptable or safe for the return of the children. Nevertheless, in November 1999, there was an extreme improvement in the cleanliness of the first level of the Ferberts' home, however, in January 2000, Katherine denied the case manager access to the house due to its uncleanly condition. Therefore, the Ferberts ignored and failed to provide a safe and

clean environment for their children in direct violation of court orders.

Recognizing our deferential standard of review, we find that this evidence supports the trial court's finding that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied.

### B. *Ind.Code § 31–35–2–4(b)(2)(C)*

The Ferberts also argue that the State failed to show by clear and convincing evidence that the termination of their parental rights was in their children's best interests. We are mindful that the MCOFC must present clear and convincing evidence for all four elements of Ind. Code § 31–35–2–4(b)(2), including evidence that termination is in the best interests of the children.

We are also mindful that in determining what is in the best interests of the children, the court is required to look beyond the factors identified by the office of family and children, and to look to the totality of the evidence. *J.K.C. v. Fountain County Dept. of Public Welfare,* 470 N.E.2d 88, 92 (Ind.Ct.App.1984). In so doing, the trial court must subordinate the interests of the parents to those of the children involved. *Id.* at 93. However, the trial court need not wait until the children are irreversibly influenced such that their physical, mental and social growth is permanently impaired before terminating the parent-child relationship. *Id.*

We find that the record contains sufficient evidence that termination of the Ferberts' parental rights is in the best interests of T.F. and E.F. The children's Guardian ad Litem and the Family Case Manager testified that reunification with the Ferberts was not in the children's best interests because the Ferberts had not demonstrated an ability to effectively use the services recommended to them to properly care for their children. Moreover, Katherine's refusal to separate from Monty in spite of her knowledge of the no contact order is a decision which fails to place the best interests of her children before her own interests.

Recognizing that the trial court listened to the testimony of all the witnesses, observed their demeanor, and judged their credibility, as a reviewing court, we must give proper deference to the trial court. Accordingly, we hold that the trial court was justified in concluding that the MCOFC proved by clear and convincing evidence that the Ferberts' parental rights should be terminated.

### CONCLUSION

Based on the foregoing, we conclude that the Ferberts' due process rights were not violated and there was sufficient evidence to support the involuntary termination of the Ferberts' parental rights under Ind.Code § 31–35–2–4(b)(2).

Affirmed.

DARDEN, J., concurs.

ROBB, J., concurs with opinion.

ROBB, Judge, concurring.

I respectfully concur, but write separately to express concerns about the growing interplay between CHINS proceedings and proceedings to terminate parental rights. I agree that these are two separate proceedings. However, recent legislative changes have expedited the time guidelines for bringing a termination action after a CHINS has been established. At some point, should the absolute minimum time limits be followed in bringing a termination proceeding, the lack of a case plan could be so egregious as to affect a party's due process rights. However, the record before us does not indicate that the parties, in this case, were without knowledge of what was expected of them. Therefore, they had fair warning that they were not in compliance. For this reason, I believe the majority is correct.