**In re The Termination of the Parent–Child Relationship of A.P., minor child, and Eduardo Perez, her father.**

**Eduardo Perez, Appellant–Respondent,**

**v.**

**Marion County Department of Child Services, Appellee–Petitioner,**

**and**

**Child Advocates, Inc., Co–Appellee (Guardian Ad Litem).**

No. 49A04–0708–JV–471.

Court of Appeals of Indiana.

March 20, 2008.

Rehearing Denied May 20, 2008.

Ann M. Sutton, Marion County Public Defender, Appellate Division, Lilaberdia Batties, Batties & Associates, Indianapolis, IN, Attorneys for Appellant.

Tammi Forster, Marion Cty. Dept. of Child Services, Indianapolis, IN, Attorney for Appellee, Dept. of Child Services.

**OPINION**

BAKER, Chief Judge.

Appellant-petitioner Eduardo Perez appeals the trial court's order terminating

the parent-child relationship of Perez and his minor child, A.P. In particular, Perez argues that the notice of the termination hearing, which was effected by publication, was so defective that it denied him due process, that the trial court erroneously denied Perez's attorney's request for a continuance, and that Perez received the ineffective assistance of counsel. Finding no error, we affirm the judgment of the trial court.

## FACTS

A.P. was born on March 16, 2006, to Perez and Vickie Scott. On March 21, 2006, Marion County Department of Child Services (DCS) filed a petition alleging A.P. and her two-year-old sister, M.S.,[1] to be Children in Need of Services (CHINS). Among other things, the CHINS petition alleged that Scott "uses cocaine, THC and other drugs and she and [A.P.] tested positive for the same after giving birth." Appellant's App. p. 25.[2] Additionally, the petition explained that the whereabouts of Perez were unknown and that he had not "come forward and demonstrated to DCS the ability or willingness to appropriately parent [his child] at this time." Id. A.P. was removed from Scott's care and she and her sister were placed with a maternal relative.

The trial court held an initial hearing on the CHINS petition on March 21, 2006, at which Perez appeared. The trial court continued the hearing until April 19, 2006, to ensure that an interpreter would be available for Perez, who is most comfortable speaking Spanish.

Perez participated in a parenting assessment on March 30 and April 5, 2006. The report that was prepared following the assessment reveals that Perez was born and raised in Mexico but moved to the United States in 1997 to work and send money to Mexico to help his family. He grew up in an unstable environment with a father who physically abused Perez. The report also includes the following observations of the interactions between Perez, M.S., and A.P.:

> Mr. Perez held [A.P.] for the majority of the visit and looked at her, giving her many kisses and talking to her at times.... Mr. Perez put his arm around [M.S.] and talked to her. She was very comfortable with him. Mr. Perez put a blanket over [M.S.] and she put her head on his shoulder.... Mr. Perez told [M.S.] to stop coloring on the floor and she listened to him.... Mr. Perez played with [M.S.] and colored with her....
>
> Ms. Scott and Mr. Perez were attentive to their children throughout the visit.... Mr. Perez also interacted well with [M.S.] and [A.P.].... No concerns were noted during the visit.

Ex. 8. The report also describes Perez's history of alcohol abuse:

> ... Perez disclosed [that] his first taste of alcohol was at the age of 14. He reported he used to drink every week-

---

1. The father of M.S. is Orlin Mejia, whose parental rights were also terminated.

2. DCS filed a motion to strike portions of the appellant's appendix. Specifically, it argues that Perez erroneously included documents and transcripts from the CHINS proceeding that were not introduced into evidence at the termination hearing. CHINS actions and termination of parental rights actions are separate proceedings. See Ind.Code § 31–34 et seq. (CHINS actions), Ind.Code § 31–35 et seq. (termination actions). Inasmuch as it is improper to support an appellate argument with evidence that is outside of the trial court record, Chesterfield Mgmt., Inc. v. Cook, 655 N.E.2d 98, 101 (Ind.Ct.App.1995), we will enter an order contemporaneously with the publication of this opinion granting DCS's motion to strike portions of Perez's appendix.

end, from Friday to Sunday, and would drink 20 beers every time he drank. He reported his current usage is drinking only one or two beers. He reported the last time he drank was last week. . . . Perez reported being arrested one time for a DUI ... in May 2003. He was placed on Probation for one and a half years, from November 2003 to April 2005. . . . Perez reported other people have told him he has an alcohol problem and gave him a hard time about his use. Mr. Perez denied that he has an alcohol problem.

*Id.* Finally, the assessment explains that Perez "appeared forthcoming with his alcohol and legal history. Mr. Perez reported he did not want to complete services; however, if it was found necessary, he would complete services." *Id.* The person who prepared the report concluded that the prognosis for the reunification of A.P. with Perez was "fair" at that time and stated that Perez "must participate in an Outpatient Program to address his past alcohol use" and "participate in home based counseling to address how his alcohol use can affect his parenting. . . ." *Id.*

Perez failed to appear at the continued April 19 hearing, but the trial court declined to issue a bench warrant because "if he needed an interpreter, there's a possibility he doesn't understand what's going on." Tr. p. 8. The trial court then reset the hearing for May 17, 2006. At the May 17, 2006, hearing, Perez and an interpreter were present and Perez admitted the allegations in the CHINS petition. The trial court entered a dispositional order requiring Perez's parental participation. Perez did not visit A.P. consistently, making an effort to see his daughter only three times following the CHINS determination, and he failed to participate in an outpatient program for his alcohol use or in home-based counseling.

At some point between December 2006 and January 2007, Perez was deported "due to criminal activity." *Id.* at 40. Specifically, an arrest warrant for battery had been issued for Perez. *Id.* at 45. On January 24, 2007, DCS filed a petition to terminate the parental relationship between A.P. and Perez. On March 1, 2007, Perez telephoned his case manager from a Mexican telephone number, informing her that he was living in Mexico but failing to provide an address. Public defender Barbara Clements entered her appearance for Perez on March 13, 2007.

Perez's brother, Gilberto Padilla, attended a May 1, 2007, facilitation hearing on Perez's behalf. At that hearing, the trial court scheduled the termination hearing to take place on June 18, 2007. A notice of the hearing date was mailed to Perez's last known address in Mexico. He spoke to his case manager on May 1, 2007, and she informed him of the upcoming trial date and encouraged him to contact his attorney. At some point, Perez informed another case manager that if he returned to the United States, he would face criminal charges and possible jail time.

Perez failed to appear at the June 18, 2007, termination hearing, though his brother again appeared on his behalf. At the start of the hearing, Perez's attorney requested a continuance based on her failure to communicate successfully with her client:

Your Honor, I'm moving for a continuance on behalf of my client, Eduardo Perez. I can't even say that I actually know his correct name because every time he calls me he says he's Eduardo Padilla. . . . I have had quite a bit of contact with him. He calls me frequently. He often leaves me several messages a week, but they are all in Spanish. He is calling me from Mexico. At one point I had the interpreter for the

Marion County Public Defender Agency ... come to my office. She sat there and talked to him and then interpreted so I could understand him. But it was, it was extremely difficult because getting her in my office at the moment he called was nearly impossible. Additionally, he leaves, he leaves me numbers where to reach him and he has left me numbers frequently, but he leaves them in Spanish so I can't even understand them. I have had numerous contacts with the Mexican Consulate. They have called me. They have sent a report that Mr. Padilla had [a visit] from a social worker in Mexico. It of course is in Spanish. They sent me a translation of the report, which it's such a poor translation it doesn't even make any sense to me. Judge, there are immigration issues involved in this case which I am completely and totally incapable of addressing at this point.

\* \* \*

The Mexican Consulate has told me that Mr. Perez is in Mexico. He cannot return to this country. As far as I can see, his child, [A.P.,] is a U.S. citizen by virtue of the fact that she was born here. According to the Mexican Consulate, in the view of Mexico, she has dual citizenship. The United States does not recognize dual citizenship. We consider her only a United States citizen. However, Mexico considers the child [A.P.] to have dual citizenship with the United States and with Mexico.... I know absolutely no Spanish.... The Mexican Consulate tells me that because he's had a report from a social worker in Mexico, that we should be able to transport this child to Mexico to an appropriate home where the father is. I can't even understand the report. I don't understand why he's in Mexico. I do not understand why my client is not returning to the United States. When I talked to him he speaks in Spanish. I don't understand him. On one occasion I had our interpreter there and she was trying to explain the legal process to him and it took about 45 minutes just for her to speak to him and for her to then translate to me what he said. I need a continuance Judge. These immigration issues are, I mean, I gotta tell you, termination of parental rights is right up my alley ..., but I know nothing about immigration law. I know nothing about why my client's in Mexico. I can't understand him....

Tr. p. 42–44. The trial court denied the request for a continuance and proceeded to hold the termination hearing as scheduled. Although Perez's attorney did her best to cross-examine DCS's witnesses, she did not have any witnesses of her own or evidence in favor of Perez to present. On June 18, 2007, the trial court entered an order terminating Perez's parental rights, finding as follows:

Father completed his parenting assessment as ordered. He did not participate in outpatient drug and alcohol treatment toward home based counseling. He participated in three supervised visitation sessions with his child. His only other contact was showing up at the foster parent's house at night, unannounced and intoxicated. Father has a current warrant for domestic battery, but was deported to Mexico in December of 2006 or January of 2007. His ability to parent a child is unknown. He did not show a willingness to participate in court ordered services while still in the United States. From his admission during his parenting assessment, any support system from family members would be suspect.

Appellant's App. p. 99–100. Perez now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

 We will not set aside the trial court's judgment terminating a parent-child relationship unless it is clearly erroneous. *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind.Ct.App.1997). We neither reweigh the evidence nor judge the credibility of witnesses, and we will consider only the evidence that supports the trial court's decision and the reasonable inferences that may be drawn therefrom. *Id.* If the evidence and the inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d 204, 208 (Ind.Ct.App. 1999).

 We acknowledge that the involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all rights of a parent to his or her children. *Id.* Therefore, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id.* The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Id. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities. *Id.*

### II. Notice by Publication

 Perez first argues that he was denied due process under the United States and Indiana constitutions based on DCS's faulty notice by publication of the June 18 termination hearing.[3] Initially, we note that Perez did not raise this argument at trial; consequently, he has waived the argument. *See Troxel v. Troxel,* 737

N.E.2d 745, 752 (Ind.2000) (finding that appellant who had failed to argue violation of due process to the trial court waived the issue for appellate review). Waiver notwithstanding, we observe that Perez had actual notice of the hearing. His case manager informed him during the May 1, 2007, telephone call that the termination hearing had been scheduled for June 18. Furthermore, Perez's brother appeared at the hearing on his behalf. Under these circumstances, we decline to reverse the trial court's termination order on this basis.

### III. Motion for a Continuance

 Perez next contends that the trial court erroneously denied his request for a continuance. The decision to grant or deny a motion for a continuance rests within the sound discretion of the trial court, and we will not disturb the trial court's ruling absent a showing of clear and prejudicial abuse of discretion. *Parmeter v. Cass County Dep't of Child Servs.,* 878 N.E.2d 444, 449 (Ind.Ct.App.2007).

It is evident that there were profound obstacles facing Perez's appointed attorney. She had been Perez's attorney for only three months at the time of the termination hearing. During those three months, she was unable to learn his correct last name, whether he had left the United States voluntarily or had been deported (and if he had been deported, the reason for the deportation), whether he ever planned to return, A.P.'s citizenship status, and to what extent the Mexican government's preference to place A.P. in that country mattered for the purpose of terminating Perez's parental rights. A Spanish interpreter was able to help to a certain extent, but inasmuch as all of the

---

**3.** DCS concedes that the advertisement, which was placed in the Indianapolis Court & Commercial Record, mistakenly sought to no-tify *"Elderado* Perez," rather than *Eduardo* Perez, of the upcoming hearing. Ex. 7 (emphasis added); Appellee's Br. p. 9.

attorney-client contact took place over the phone, a great deal of miscommunication and misunderstanding persisted.

We believe that the better course of action would have been for the trial court to have granted a continuance. A continuance would have afforded Perez's attorney more time to communicate with her client, better understand the underlying factual circumstances, and seek assistance from someone better versed in immigration law.

That said, we appreciate the expedited nature of termination hearings in general. Whatever the ultimate resolution may be, it is always in the best interests of the child(ren) involved to reach it as promptly as possible. Moreover, in this specific situation, everyone involved agreed that it was unlikely that Perez planned to return to the United States and that, if he did, he would face battery charges and possible jail time. Thus, we believe that it was reasonable for the trial court to conclude that even if Perez's attorney had been granted more time to communicate with her client, she would still ultimately face the same problem—defending the parental rights of a client who lives in a different country than his child and has no plans to return because, among other things, he allegedly engaged in criminal activity while he was here. Under these circumstances, although we believe it would have been equally appropriate-and perhaps more desirable—for the trial court to have granted the continuance, we cannot say that the trial court abused its discretion in denying the request.

### IV. Assistance of Counsel and Sufficiency of the Evidence

Perez argues that he received the ineffective assistance of counsel, resulting in the termination of his parental rights. Our Supreme Court has explained that in a termination case, we analyze the effectiveness of counsel as follows:

> [w]here parents whose rights were terminated upon trial claim on appeal that their lawyer underperformed, we deem the focus of the inquiry to be whether it appears that the parents received a fundamentally fair trial whose facts demonstrate an accurate determination. The question is not whether the lawyer might have objected to this or that, but whether the lawyer's overall performance was so defective that the appellate court cannot say with confidence that the conditions leading to the removal of the children from parental care are unlikely to be remedied and that termination is in the child's best interest.

*Baker v. Marion County Office of Family and Children*, 810 N.E.2d 1035, 1041 (Ind. 2004) (footnote omitted).

Thus, to determine whether Perez received effective representation, we must also examine the evidence supporting the termination of his parental rights. To effect the involuntary termination of a parent-child relationship, the State must present clear and convincing evidence establishing the following elements:

(A) one (1) of the following exists:

 (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

 (ii) a court has entered a finding under IC 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

 (iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a

county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;

(B) there is a reasonable probability that:

 (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

 (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind.Code § 31–35–2–4(b)(2).

■■■■ In construing this statute, this court has held that when determining whether certain conditions that led to the removal of the children will be remedied, the trial court must judge the parent's fitness to care for the children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re D.J.*, 755 N.E.2d 679, 684 (Ind.Ct. App.2001). A parent's habitual pattern of conduct must also be evaluated to determine the probability of future negative behavior. *Id.* The trial court need not wait until a child is irreversibly harmed such that his physical, mental, and social development are permanently impaired before terminating the parent-child relationship. *Id.*

■■■■ Additionally, the trial court may consider the services offered as well as the parent's response to those services. *Id.* Parental rights may be terminated when parties are unable or unwilling to meet their responsibilities. *Ferbert v. Marion County OFC*, 743 N.E.2d 766, 776 (Ind.Ct.App.2001). Also, when determining what is in the best interests of the

children, the interests of the parents are subordinate to those of the child. *Id.* at 773. Thus, parental rights will be terminated when it is no longer in the child's best interests to maintain the relationship. *In re B.D.J.*, 728 N.E.2d 195, 200 (Ind.Ct. App.2000).

It is undisputed that A.P. had been removed from Perez for over six months at the time of the termination hearing and that there is a satisfactory plan for her care and treatment—continued placement with and eventual adoption by her mother's cousin, who has been caring for A.P. since she was removed from her parents' care.

■■■■ Perez first argues that there is insufficient evidence establishing that the conditions that resulted in A.P.'s removal will not be remedied or that continuation of the parent-child relationship poses a threat to the child's well being. Initially, we note that the statute is written in the alternative; consequently, DCS is required to prove only one of these elements. We choose to focus on whether DCS established that the conditions that resulted in A.P.'s removal from Perez will not be remedied. With regard to Perez, the CHINS petition explained that his whereabouts were unknown and that he had not "come forward and demonstrated to DCS the ability or willingness to appropriately parent [his child] at this time." Appellant's App. p. 25.

■■■■ Between the time of the filing of the CHINS petition and the termination hearing, Perez completed some services but failed to complete others, such as an outpatient program for his alcohol use. He visited A.P. only three times. He failed to keep his case manager updated about his address. He left the country nine months after A.P.'s removal and had not demonstrated his willingness or ability

to parent his daughter before that point in time. There is no evidence that he plans to return to the United States. If he does return, he may face jail time for pending battery charges. He offers no plan for A.P.'s care should his parental rights not be terminated. Thus, we find that there is sufficient evidence establishing that he was unable or unwilling to appropriately parent A.P., just as he was when the CHINS removal originally occurred. Ultimately, therefore, DCS established that the conditions that resulted in A.P.'s removal will not be remedied. Given that Perez was still in Mexico at the time of the termination hearing, gave no indication that he planned to return to this country, and failed to take full advantage of court-ordered services while he was in the United States, and that A.P. is bonded to her caregiver and has thrived during the placement, we likewise find that the trial court appropriately concluded that termination of Perez's parental rights was in the child's best interest.

Circling back to the effectiveness of Perez's attorney, we must consider whether Perez received a fundamentally fair trial whose facts demonstrate an accurate determination and whether the lawyer's overall performance was so defective that we cannot say with confidence that DCS adequately proved its case. *Baker*, 810 N.E.2d at 1041. It is undeniable that there were troubling aspects of Perez's termination hearing, which we have already described above. We wish that the trial court would have handled the situation differently and we commend Perez's attorney for doing the best she could under extraordinarily difficult circumstances. Before the hearing, she consulted with a colleague who is well-versed in immigration law, she used an interpreter to speak to her client on the telephone, and she spoke with the Mexican consulate a number of times. She effectively communicated the obstacles she faced to the trial court, and when the trial court denied her request for a continuance, she soldiered ahead to the best of her ability. She cross-examined a DCS witness, compared her exhibits received in discovery with those proffered at trial for purposes of objecting to their introduction, requested that Perez's brother be permitted to observe the trial, and renewed the motion for a continuance. Given the attorney's efforts and the underlying facts that she could not change—for example, her client was in Mexico and intended to remain there—we find that Perez's trial was not fundamentally unfair and we can say with confidence that DCS adequately proved its case in favor of termination.

The judgment of the trial court is affirmed.

DARDEN, J., and BRADFORD, J., concur.