**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 24 2012, 8:32 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT
M.M. (Mother):

**CYNTHIA PHILLIPS SMITH**
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEY FOR APPELLANT
C.L.M. (Father):

**GREGG S. THEOBALD**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**CHRISTINE REDELMAN
ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: K.N., C.M, and K.M., (Minor Children), and M.M., (Mother) and C.M., (Father), | ) ) ) ) ) |
| Appellants, | ) ) |
| vs. | ) No. 79A04-1109-JT-541 ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee. | ) ) |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta H. Rush, Judge
The Honorable Faith A. Graham, Magistrate
Cause Nos. 79D03-1106-JT-78, 80, and 82

**May 24, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

STATEMENT OF THE CASE

M.M. ("Mother") appeals the involuntary termination of her parental rights to K. N., C.M., and K.M. C.L.M. ("Father") appeals the involuntary termination of his parental rights to K.N. and C.M.

We affirm.

ISSUES

1. Whether there is clear and convincing evidence to support the involuntary termination of Mother's parental rights to K.N., C.M., and K.M.

2. Whether there is clear and convincing evidence to support the involuntary termination of Father's parental rights to K.N. and C.M.

FACTS

K.N. was born to Mother and Father on July 7, 2003, and C.M. was born to Mother and Father on January 8, 2007. K.M. was born to Mother and W.D. on March 30,

2

2010.[1]  In 2005, the maternal grandparents were made guardians of K.N. after Mother was arrested and convicted of possession of a controlled substance and conversion.  K.N. has remained in her maternal grandparents' care since that time.

In 2008, the Tippecanoe County Department of Child Services ("DCS") substantiated a report of neglect against Mother for lack of supervision and endangerment when Mother left one-year-old C.M. home alone.  The maternal grandparents became guardians of C.M.  Mother was supposed to reunite with K.N. and C.M. in 2009; however, Mother could not be located for visits or for reunification.  Father was unable to care for the children because he was incarcerated.

On March 31, 2010, DCS received a report indicating that Mother, because of mental health and housing issues, was incapable of taking care of the newly born K.M. On April 5, 2010, the juvenile court found probable cause that K.M. was a victim of abuse or neglect, and K.M. was taken from Mother's custody.  On June 29, 2010, the juvenile court found that K.M. was a child in need of services ("CHINS").  On August 5, 2010, the court ordered Mother to (1) regularly visit with K.M.; (2) cooperate with home-based services; (3) successfully complete parenting classes; (4) obtain employment; (5) maintain adequate housing; (6) abstain from use of alcohol and/or illegal drugs; (7) attend

---

[1] W.D. voluntarily surrendered his parental rights and is not a party to this appeal.

all medication and psychiatric appointments and follow recommendations; and (8) participate in a psychological evaluation and follow recommendations.

On October 13, 2010, DCS filed a CHINS petition with reference to K.N. and C.M., and the juvenile court, after hearings, found both children to be CHINS.[2] The juvenile court found that Mother (1) had several mental health diagnoses and took numerous medications; (2) was twice arrested; (3) missed several weeks of visits; (4) experienced compliance issues which resulted in termination of services; and (5) exhibited a lack of progress in K.M.'s CHINS case. The court offered Mother services similar to those offered in K.M.'s case, and it offered Father any services available through DOC. The court ordered Father to notify DCS of his release from prison, which was expected to occur in April 2012.

On June 24, 2011, after a permanency hearing, the juvenile court entered an order changing the permanency plan from reunification to termination of the parent-child relationship and adoption. After termination hearings on July 27, 2011, and on August 24, 2011, the juvenile court entered findings of fact and conclusions of law in support of its determination that Mother's parental rights should be terminated as to K.N., C.M., and K.M. and that Father's parental rights should be terminated as to K.N. and C.M. The juvenile court determined that there was no reasonable possibility that the reasons for continued placement outside the home would be remedied and the continuation of the

---

[2] At this time, the maternal grandparents' guardianship of K.N. and C.M. had been temporarily terminated; however, the grandparents were later appointed guardians of all three children.

parent-child relationship posed a threat to the children's well being. The juvenile court also determined that termination was in the children's best interests.

Additional facts are discussed below.

DECISION

The traditional right of parents to establish a home and raise their child is protected by the Fourteenth Amendment to the United States Constitution. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Parental rights may be terminated when parents are unable or unwilling to meet their parental responsibilities. *Id.* The purpose of terminating parental rights is not to punish a parent but to protect the child. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied.*

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Bester*, 839 N.E.2d at 147. We will only consider the evidence and reasonable inferences therefrom that are most favorable to the judgment. *Id.* When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings. *Id.* Then, we determine whether the findings support the judgment. *Id.* The trial court's judgment will be set aside only if it is clearly erroneous. *Id.* "A judgment is clearly erroneous if the findings

do not support the trial court's conclusions or the conclusions do not support the judgment." *Id*. (quoting *In re R.J.*, 829 N.E.2d 1032, 1034 (Ind. Ct. App. 2005)).

When DCS seeks to terminate parental rights, it must plead and prove in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied;
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child;
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.[3]

Ind. Code § 31-35-2-4(b)(2). These allegations must be established by clear and convincing evidence. *In re I.A.*, 934 N.E.2d 1127, 1133 (Ind. 2010).

Because subsection (b)(2)(B) is written in the disjunctive, DCS need prove only one of the elements by clear and convincing evidence. *See I.A.*, 934 N.E.2d at 1133. Thus, if we hold that the evidence sufficiently shows that there is reasonable probability that the conditions resulting in removal or the reasons for placement outside the home of the parents will not be remedied, we need not address whether the continuation of the

---

[3] Neither Mother nor Father contends that DCS presented insufficient evidence that there is a satisfactory plan for care and treatment of the children.

6

parent-child relationship poses a threat to the well-being of the child. *See* I.C. § 31-35-2-4(b)(2)(B); *In re A.N.J.*, 690 N.E.2d 716, 721 n.2. (Ind. Ct. App. 1997).

With regard to the "best interests of the child" statutory element, the trial court is required to consider the totality of the evidence and determine whether the custody by the parent is wholly inadequate for the child's future physical, mental, and social growth. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. In making this determination, the trial court must subordinate the interest of the parent to that of the child involved. *Id.* The recommendations of the CASA and the child's caseworker that parental rights be terminated support a finding that termination is in the child's best interests. *See A.J. v. Marion County Office of Family and Children*, 881 N.E.2d 706, 718 (Ind. Ct. App. 2008), *trans. denied*.

1.      Termination of Mother's Rights

        a.      *Conditions Remedied*

Mother contends that the juvenile court erred in concluding that the conditions that resulted in the children's removal and continued placement outside Mother's home would not be remedied. For the most part, Mother cites her own testimony from the termination hearing in support of her contention, while occasionally citing testimony by others that is qualified by other testimony. In essence, Mother is asking us to reweigh the evidence, which we will not do.

7

The juvenile court should judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* "However, a parent's habitual patterns of conduct must also be considered to determine whether there is a substantial probability of future neglect or deprivation." *Id.* "[A] trial court does not need to wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *Castro v. Ind. Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied.* When the evidence shows that the emotional and physical development of a child is threatened, termination of parental rights is appropriate. *Id.*

The juvenile court may consider a parent's history of neglect, failure to provide support, lack of adequate housing and lack of employment, among other things. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). DCS is not required to rule out all possibilities of change; rather it need establish "only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

In support of its determination pertaining to Mother's parental rights, the juvenile court found that at the time of K.M.'s birth, the older children, K.N. and C.M., were living with the maternal grandparents because of Mother's inability to parent. This

inability was manifested by Mother's "numerous mental health diagnoses and medications"; her bouts with debilitating depression; her financial difficulties; her refusal to receive assistance from "Healthy Families"; her inability "to think clearly when she takes her medication"; her criminal history, including her two arrests subsequent to the CHINS proceeding; and her "discharge[] from services for lack of compliance." (App. 18-19).

The juvenile court also found:

Mother has a long-term history of instability. Mother's mental health issues became apparent as an adolescent. Mother has participated in therapy and medication management since approximately the 8th grade. Mother has displayed an ongoing pattern of hospitalizations, incarcerations, and disappearances since adulthood. During the CHINS case, Mother was only sporadically compliant with therapeutic services to address her mental health issues. Mother failed to timely complete a psychological evaluation and a medication evaluation. Mother reports she is currently prescribed medications for ADHD, anxiety, panic disorder, and PTSD. Although Mother manages to attend appointments to obtain her medications, she displays an inability or unwillingness to regularly attend therapy or other services. Mother often becomes so emotionally overwhelmed that her functioning is extremely limited.

Mother failed to regularly participate in case management services designed to assist with improving her stability. Mother was discharged from three (3) separate service providers for non-compliance. Mother's primary areas of need included housing, employment, stability, medication management, and scheduling. Mother made little to no progress in any area. Mother was evicted from her residence in October 2010 and then voluntarily left Seeds of Hope transitional housing in March 2011. Since then, Mother has been essentially homeless residing with friends or in her car. Mother is unemployed and reports having no current funds. Mother is currently unemployed and has not worked since October 2010. Mother receives disability funds which she badly manages herself. Mother has provided no meaningful financial assistance for the children.

9

Mother's relationship with the children and the Maternal Grandparents has been strained over an extended period of time. Mother failed to regularly attend visitations during the CHINS proceeding providing various excuses. When Mother did attend, she was continuously late. Although Mother was capable of appropriately interacting with the children during visits, her sporadic contact and unexplained absences negatively impacted the children who were hurt and sad when Mother failed to arrive or arrived late. Even when Maternal Grandparents supervised Mother's visitation, she often failed to appear or arrived inordinately late. Even though Mother acknowledged the harm to her children, she still failed to maintain regular visitations as a result of "a lot of chaos in her life."

(Father's App. 20).

The juvenile court found that at the conclusion of the CHINS hearings it had "noted that Mother had serious mental health needs that must be met before she is able to handle daily tasks let alone care for the children." (Father's App. 19). Additionally, the juvenile court found that even though many services had been offered to Mother, "[a]t the time of the termination hearing, [Mother was] in no better position to care for the children." *Id.*

Mother does not contest the evidence that she again was arrested during the CHINS proceedings, and she does not contest testimony that she has in the past and will continue to periodically break the law. Furthermore, she does not contest testimony indicating that she is homeless by choice, unemployed, and does not manage her disability benefits in an appropriate manner. She does contest the court's findings about her receipt of services; however, she fails to recognize that the court found that she made no significant progress, not that she made no progress at all.

10

Allie Vice, a family development consultant who worked with Mother in the Area 4 program from November 9, 2010 until April 15, 2011, testified that Mother was either unwilling or incapable of working through her mental health problems. Vice, who was working with Mother "on employment, housing, stability, [and] keeping appointments with [Mother's] mental health professionals," testified that Mother's "challenges" continued to be her mental health problems, her lack of "consistent care," and her unexplained failure to keep appointments. (Tr. 106, 108). Vice also testified that Mother eventually was terminated for lack of participation in the program. Vice noted that "it was really hard to distinguish whether her lack of participation was due to her mental health issues or whether it was more a part of her unwillingness to participate," as "[s]he would sometimes revert into meltdowns, crying spells, especially if you would request her to do something she was not willing or looking forward [to] doing." (Tr. 108).[4]

Sharon Cornell, the Court Appointed Special Advocate ("CASA"), testified that in meetings, Mother would cry, beg the counselors to allow her to live with her mom and dad, scream and yell obscenities at her dad, storm out of the meeting, and pull "her knees almost into a fetal position." (Tr. 117). Cornell also testified that Mother seemed to manipulate the counselors by going from crying to laughing at them and forcing them to readdress issues that had been previously resolved. After many meetings with Mother, Cornell testified, "I don't see her being either willing or able to comply with services and

---

[4] Indeed, our review of the record discloses that Mother had a panic attack that delayed the final termination hearing.

11

stuff to assist her since she hasn't in such a long period of time been able to find housing or stability. I don't see that that would be any different in the future." (Tr. 122).

In addition, the maternal grandmother testified that Mother has continued to have mental health problems that have prevented her from caring for the children. The maternal grandmother also testified that Mother's inability to either show up or timely participate in visitation has not changed. The maternal grandmother further testified that Mother continues to have legal problems, as Mother "[is] almost off probation and the next day [she] will go shoplift . . . ." (Tr. 158).

In short, we conclude that the juvenile court did not err in concluding that there was a reasonable probability that Mother's continued mental health problems, with their attendant instability, would not be remedied.

### b. Best Interests

Mother contends that DCS failed to establish that termination of the relationship with Mother was in the children's best interests. Mother notes that she loves the children and wants to provide a loving environment for them. Mother argues that ending a loving relationship between her and the children would not be in their best interests.

The CASA representative for all three children, Sharon Cornell, testified that termination was in the best interests of the children because Mother made no lasting progress during the course of the proceedings. Cornell further testified that Mother was afforded all possible assistance but could not abate her addiction problem, a problem that

12

would probably never be remedied and that would lead to continued instability for the children. Additionally, Cornell testified that Mother's other long-term problems would not be solved. The case manager for DCS, Ambyr Wade, concurred with Cornell that termination was in the children's best interests.

Cornell's and Wade's termination recommendations and testimony about the children's best interests, coupled with evidence that the conditions that occasioned the removal and continued placement of the children outside the home, are sufficient to support the juvenile court's conclusion that termination is in the best interests of the children.

2.    Termination of Father's Rights

a.    *Conditions remedied*

Father contends that the juvenile court erred in concluding that the conditions that resulted in K.N.'s and C.M.'s removal and continued placement outside his custody would not be remedied. The crux of Father's argument is that he became a changed man through DOC's CLIFF program and that soon after the termination hearing he would have been able to provide housing and care for the children.[5] Father contends that the juvenile court erred in not recognizing the long term effects of the CLIFF program and his claimed ability to provide for the children. He further contends that the trial court

---

[5] Father testified that after his release he would move into a duplex owned by his grandmother, obtain a job, and benefit from the financial and emotional support of his father, mother, and grandmother.

failed to recognize his imminent release date at the time of the second termination hearing.

In support of its determination pertaining to Father's parental rights, the juvenile court found that Father was offered services through the DOC. The juvenile court also found that Father "has a long-standing history of instability, substance abuse, and criminal behavior." (Father's App. 20). The juvenile court further found that "Father has been repeatedly incarcerated over the course of the last fifteen (15) years including local jail, state department of correction facilities, a federal correction facility, and a Mexican prison. The longest continuous period Father was not incarcerated occurred between 1998 and 2001." (Father's App. 20-21). Additionally, the juvenile court found that Father's convictions are related to drug possession, failure to return to lawful detention, forgery, and parole violations. The juvenile court noted that "Father was incarcerated at the onset of the CHINS proceeding and remained incarcerated [at the time the termination order was drafted]." (Father's App. 21).

The juvenile court found:

Father began the CLIFF ["Clean Living is Freedom Forever"] Program at Putnamville Correction Facility on December 6, 2010, and completed [it] on August 11, 2011. The program included individual counseling, group counseling, life skills training, and family counseling. During the program, Father disclosed a history of substance abuse with alcohol, cocaine, opiates, marijuana, and stimulants. DOC records indicate successful graduation from the program and an earliest possible release date of April 28, 2012.

Father never lived with the children. Father has failed to regularly provide financial support to the children. Father's last contact with the children was

14

in 2008 when a protective order was issued. The protective order is now expired. Father was authorized to send letters to the children during the CHINS proceeding and sent approximately seven (7) letters. There is no evidence that the Father ever attempted to terminate the protective order. There is no evidence that Father ever attempted to terminate the guardianship with Maternal Grandparents or otherwise initiate contact with the children even though Maternal Grandparents have resided in the same neighborhood with the same telephone number for the past twelve (12) years.

(Father's App. 21).

The juvenile court further found that "Father remains incarcerated with a long-term history of criminal behavior, violence, substance abuse, and instability. All imaginable services have been offered and nothing is singularly different in today's circumstances since the time of removal. To continue the parent-child relationships would be detrimental to the children." (Father's App. 21). The juvenile court concluded that "[n]either parent has yet to demonstrate the ability or willingness to make lasting changes from past behaviors. There is no reasonable probability that either parent will be able to maintain stability and/or remain substance free in order to care and provide adequately for the children." *Id.*

The juvenile court recognized that Father participated in and graduated from the DOC's CLIFF program. In its discretion as the finder of fact and arbiter of credibility, however, the juvenile court determined that Father's completion of the program was insufficient to establish a reasonable probability that Father was transformed from a recurrent occupant of correctional facilities to a constant, law-abiding citizen. In other

15

words, after reading the CLIFF report and weighing Father's testimony and observing his demeanor, the juvenile court concluded that Father's problems had not been remedied.[6] The juvenile court correctly considered Father's prior conduct, including his extensive criminal history and limited involvement with the children, to arrive at its conclusion.

The juvenile court did not address Father's future housing plans because a parent's statements about future intentions are insufficient to prove that conditions resulting in the children's removal or placement outside the home are not likely to recur. Indeed, we have held that a parent's future plans are not evidence upon which the trier of fact can base its determination, as the parent's fitness to care for the children must be assessed as of the time of the termination hearing. *See In re B.D.J.,* 728 N.E.2d 195, 202 n.1 (Ind. Ct. App. 2000).

After reviewing the evidence, we conclude that the juvenile court's determination is not clearly erroneous.[7]

### b. Best Interests

Father argues that the juvenile court erred in determining that termination was in the children's best interests. Father asks us to reweigh the evidence, which we will not do. Under the evidence presented at the termination hearing, the juvenile court's

---

[6] We acknowledge the rigor and breadth of DOC's CLIFF program, and we believe in its life-changing potential. However, under the circumstances of this case, we do not question the juvenile court's decision.

[7] We note that the timing of Father's release is not a critical component of the juvenile court's determination.

16

determination of best interests is not clearly erroneous. *See Castro*, 842 N.E.2d at 375 (holding that individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children); *Ferbert v. Marion Cnty. Office of Family and Children*, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001) (holding that parental rights may be terminated when parties are unable to meet their responsibilities), *trans. denied*.

## CONCLUSION

We conclude there was clear and convincing evidence to support the juvenile court's decision to terminate Mother's parental rights to K.N., C.M., and K.M. We also conclude that there was clear and convincing evidence to support the juvenile court's decision to terminate Father's parental rights to K.N. and C.M. We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and, therefore, affirm the juvenile court.

Affirmed.

NAJAM, J., and RILEY, J., concur.