**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**CRAIG JONES**
DCS, Tippecanoe County Local Office
Lafayette, Indiana

**ROBERT J. HENKE**
DCS, Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF | ) ) ) |
| | ) |
| J.B. (Minor Child), | ) |
| | ) |
| and | ) |
| | ) |
| T.S. (Mother), | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | )   No.  79A02-1211-JT-891 |
| | ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) |
| | ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta H. Rush, Judge

**August 14, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

In this termination of parental rights appeal, appellant-respondent, T.S.[1] (Mother), challenges the decision of the juvenile court terminating her parental rights with regard to J.B. (Child), born September 6, 2001. Mother contends that the appellee-petitioner Department of Child Services (DCS) presented insufficient evidence to show that the conditions leading to the Child's removal would not be remedied, that Mother posed a threat to the Child's well-being, and that the termination of Mother's parental rights is in the Child's best interest.

The evidence established that there was a reasonable probability that the conditions that resulted in the Child's removal would not be remedied. The DCS also showed that termination of Mother's parental rights was in the Child's best interest. As a result, we find that there was sufficient evidence to support the termination of Mother's parental rights, and affirm the judgment of the juvenile court.

---

[1] There is a discrepancy in the mother's name, but we will refer to her initially as T.S., then subsequently as Mother.

FACTS

Tippecanoe County Child Protective Services (CPS) received a report on July 26, 2009, that the Child's brother, I.A., had pushed the Child's youngest brother, Z.G., out of an upstairs window. Based on this report, CPS commenced an investigation.

During the investigation, CPS received a second report on July 28, 2009, that the Child had been transported via life-line to St. Vincent Hospital in Indianapolis as a result of a nearly fatal dose of insulin. CPS's investigation yielded that the reports were true and that Mother's apparent lack of supervision was complicated by a lack of anger management and parenting skill as well as substance abuse. The Child and his siblings[2] were removed from the Mother's care and placed in a foster home on July 28, 2009. The children were determined to be Children In Need of Services (CHINS) and placed in protective custody on July 31, 2009. A Court Appointed Special Advocate (CASA) was appointed to represent the best interest of the Child, who remained in foster care between July 28, 2009, and August 19, 2009. However, the Child was transferred to various facilities and placed in foster care.

On December 2, 2009, the Child displayed erratic behavior during a medical appointment and was admitted for a psychiatric evaluation at Valle Vista Hospital. However, he was released on December 9, 2009, "on a continued trial home visit."

---

[2] Although Mother's rights to each of these children were ultimately terminated, this appeal concerns only the Child. Therefore, we recite facts relating to the other children only as necessary to address the termination of the parent-child relationship between Mother and the Child.

Appellant's App. p. 11. However, the Child was later transported to other medical facilities, with occasional home visits.

On January 25, 2010, the CASA, Dennis Davidson, visited Mother's residence and found the home to be "a complete mess with the smell of urine permeating the air." Ex. C-1. While helping Mother clean the Child's room in May 2010, the service providers discovered feces, urine stained clothing, rotten food and maggots" in the house. DCS Ex. 3.

On May 27, 2010, the Child was again admitted to Valle Vista Hospital, causing him to be removed for a second time from Mother's care and placed in foster care until June 29, 2010. He was released from the hospital on July 9, 2010, and began a second trial home visit with Mother. However, the Child was removed from Mother's care for the third time on May 24, 2011, and placed in another treatment center. The Child was ultimately diagnosed with a number of ailments including juvenile diabetes, mood disorder, ADHD, Borderline Intellectual Functioning, and PTSD.

Pursuant to dispositional orders that the juvenile court had issued, the DCS offered Mother various services, including psychological and psychiatric evaluations, medication evaluation and management, substance abuse evaluation and treatment, and individual and family therapy. Mother was also required to undergo random drug screening.

It was later determined that Mother suffers from several mental health issues. Mother had experienced extensive trauma as a child and young adult but failed to follow

4

through with treatment after she turned eighteen. Mother has been diagnosed with cannabis dependence and PTSD, with signs of depression.

Mother made only intermittent progress in individual counseling and had difficulty managing stress, anxiety, and depression. Mother also displayed frequent anger outbursts. It was further established that Mother has ongoing difficulties with aggression as evidenced by threatening a DCS case worker and striking one of the department facilitators in the presence of her children. Mother has also refused to take her medication.

Mother struggled to maintain appropriate conditions in the home, and the residence remained infested with cockroaches and maggots. Mother eventually left that house and moved to another HUD home in March 2011. However, she later lost eligibility for HUD and was homeless for an extended period of time. Mother reportedly resided in various locations with friends, in a van under a bridge, and with her maternal grandmother on occasion. Mother eventually obtained a two-bedroom trailer on July 1, 2012.

Even though Mother was employed in July 2012, at Construction Cleaning Services, she still displayed a lengthy history of instability. Mother's employment has been sporadic at best, and she has a history of criminal behavior and drug abuse, including a conviction for operating a vehicle while intoxicated in October 1998. Mother was also incarcerated in February 2012 for driving on a suspended license.

5

During the CHINS proceedings, Mother displayed periods of progress followed by instances of non-compliance or resistance. In fact, towards the end of the CHINS proceedings, it became difficult to reach Mother for scheduling purposes. Eventually, Mother refused to participate in further case management services, despite the juvenile court's admonishment that Mother's failure to do so would hinder reunification with the Child.

The Child ultimately transitioned to foster care on February 23, 2012. At the hearing on the petition to terminate Mother's parental rights that was held on August 17, 2012, Davidson testified in support of terminating Mother's parental rights as being in the Child's best interests. In fact, Davidson had recommended termination of parental rights for all of Mother's three children for some time.

The evidence established that Mother and her children have been involved in the system since 2002, when the Child's sibling tested positive for marijuana at birth, and Mother failed to successfully complete a service referral agreement and continued to use marijuana. Davidson noted that Mother has continued to use marijuana since the time of her children's placement in foster care, that she lacks stability, and has never made sustainable progress in managing the children's behaviors and maintaining the household. Furthermore, the evidence established that the Child responded positively to a structured environment after being placed in foster care. His diabetes is under control and his behaviors have stabilized.

Lindsay Schilling, a child welfare specialist, Melissa Adamson, a community support case manager, and Luann Horton, a therapist who provided individual therapy for the Child, all testified that they had seen positive changes in the Child because of the support that he was getting from his foster parents. Horton specifically testified that Child will thrive in his new environment because he will have a home with parents who are steadily employed and can provide the love and care that he needs.

The juvenile court issued an order terminating Mother's parental rights, having found that there is a reasonable probability that the conditions that resulted in the removal of the Child from Mother's care will not be remedied because Mother has yet to demonstrate the ability or willingness to make lasting changes from past behaviors. The juvenile court also found no reasonable probability that Mother will be able to maintain stability and remain substance free to adequately care for the Child. The juvenile court also found that the continuation of the parent-child relationship poses a threat to the Child's well-being. Finally, the juvenile court concluded that terminating Mother's parental rights were in the Child's best interests. Mother now appeals.

## DISCUSSION AND DECISION

### I. Termination of Parental Rights—Standard of Review

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to raise their children. Troxel v. Granville, 530 U.S. 57, 65 (2000); Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). But parental rights are not absolute and must be subordinated to the child's

interest in determining the proper disposition of a petition to terminate parental rights. In re D.D., 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004). Thus, "parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." Id. at 265. The purpose of terminating parental rights is not to punish parents but to protect their children. In re S.P.H., 806 N.E.2d 874, 880 (Ind. Ct. App. 2004).

When reviewing the termination of parental rights, we neither reweigh the evidence nor judge the credibility of the witnesses. In re G.Y., 904 N.E.2d 1257, 1260 (Ind. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment below. Id. Here, the juvenile court made specific findings of fact and conclusions of law in its order terminating parental rights.

Where the juvenile court enters specific findings and conclusions, we apply a two-tiered standard of review. Bester, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, and then whether the findings support the judgment. Id. We will not set aside the juvenile court's judgment unless it is clearly erroneous. In re A.A.C., 682 N.E.2d 542, 544 (Ind. Ct. App. 1997). A judgment is clearly erroneous when the evidence does not support the findings, or the findings do not support the result. In re S.F., 883 N.E.2d 830, 834 (Ind. Ct. App. 2008).

The elements that the DCS must allege and prove by clear and convincing evidence to effect the termination of parental rights are set forth in Indiana Code section 3l-35-2-4(b)(2), which provides:

8

(A) that one (1) of the following is true:

    (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

    (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

    (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

    (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

I.C. § 31-35-2-4(b)(2).

We note that Indiana Code section 31-35-2-4 (b)(2)(B) is written in the disjunctive, which requires that only one of the sub-elements, under subsection (B), be proven true by clear and convincing evidence.  In re L.S., 717 N.E.2d 204, 209 (Ind. Ct. App. 1999).

9

## II. Sufficient Evidence

### A. Conditions Leading to Removal

Mother asserts that the termination order must be set aside because the DCS failed to adequately establish that the conditions resulting in the Child's removal would not be remedied and that the continuation of the parent-child relationship poses a threat to the Child.

As noted above, because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find either that the conditions resulting in removal will not be remedied or that the continuation of the parent-child relationship poses a threat to the children. In re C.C., 788 N.E.2d 847, 854 (Ind. Ct. App. 2003). As a result, "where, as here, the [juvenile] court specifically finds that there is a reasonable probability that the conditions which resulted in the removal of the [child] would not be remedied, and there is sufficient evidence in the record supporting the [juvenile] court's conclusion, it is not necessary for [DCS] to prove or for the [juvenile] court to find that the continuation of the parent-child relationship poses a threat to the [child]." In re S.P.H., 806 N.E.2d at 882.

When determining whether the conditions that led to a child's removal will not be remedied, the juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing. In re A.B., 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). However, the juvenile court's inquiry must also evaluate a parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id.

10

The juvenile court may properly consider a parent's history of neglect, criminal history, failure to provide support, lack of adequate housing, and lack of employment, among other things. McBride v. Monroe Cnty. OFC, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The juvenile court may also consider the services that the DCS has offered to a parent and the response to those services. In re M.S., 898 N.E.2d 307, 311 (Ind. Ct. App. 2008). The DCS is not required to rule out all possibilities of change; rather, it need establish "only that there is a reasonable probability that the parent's behavior will not change." In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Parental rights may be terminated when parties are unable or unwilling to meet their responsibilities. Ferbert v. Marion Cnty., OFC, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001).

In this case, the evidence established that the Child was removed from Mother's home after he was transported via life-line to St. Vincent Hospital as a result of a nearly fatal overdose of insulin that caused him to be unconscious with potentially serious brain damage. Mother's lack of supervision over the Child was complicated by her lack of anger management, lack of parenting skills, and substance abuse. Appellant's App. p. 11.

Although Mother does not expressly challenge the juvenile court's findings, she maintains that the juvenile court should have taken into account the severe challenges and needs of the Child and that she should have been granted an extended period of time to learn to deal with these challenges before her parental rights were terminated. Appellant's Br. p. 18-19. Notwithstanding this contention, the termination statutes do not require the court to give a parent additional time to meet his or her obligations under the

11

parent participation plan.  See  Prince v. Dept. of Child Serv., 861 N.E.2d 1223, 1230 (Ind. Ct. App. 2007) (citing Ind. Code § 31-35-2-6, which states that "a hearing requested on a petition to terminate rights following a CHINS determination must be commenced within 90 days and completed within 180 days").  Moreover, the record shows that Mother was given ample time to comply with the juvenile court's orders and DCS's plans of participation.

In this case, the clear and convincing evidence establishes that the allegations of the petition to terminate Mother's parental rights were true.  And prior to the filing of that petition, it was established that Mother has been involved in the system since 2002, when the Child's sibling tested positive for marijuana at birth.  Appellant's App. p. 14.  The Child and his sibling were removed from Mother's home and placed in foster care between February 20, 2003, and July 14, 2003.  Id.  Mother failed to successfully complete a service referral agreement at that time, and she continued to use marijuana. Id.  Also, as discussed above, the evidence established that Mother's lack of supervision over her children was complicated by her inability to control her anger and continued substance abuse.

In light of the evidence described above, it is apparent that the DCS, CASA, and the juvenile court, all made numerous attempts to facilitate the preservation of Mother's family by affording Mother several chances to remedy her conditions and by offering Mother exhaustive services that are designed to address her difficulties.  Id.

12

Indeed, at the outset of the CHINS proceedings, Mother participated in the services that were offered on a regular basis, but she later became reluctant to schedule appointments. And toward the end of the CHINS proceedings, Mother became difficult to reach and eventually refused further parenting services. Id. at 13. As previously discussed, Mother failed to participate in services after the November 2011 permanency hearing, despite the juvenile court's admonishment that her failure to do so would impede reunification. Id. Despite all efforts, the problems that continue to plague Mother and the Child always returned.

In sum, Mother's inability to successfully complete the court-ordered services and programs demonstrates unwillingness on her part to make lasting changes from past behaviors. In other words, the DCS established that there is no reasonable probability that Mother will be able to maintain stability and remain substance free to care for the Child. In short, Mother lacked the ability to meet the Child's needs. Thus, we decline to disturb the juvenile court's ruling on this basis.

### B. Child's Best Interest

Mother also contends that the juvenile court erred when it determined that termination of her parental rights is in Child's best interest. Mother argues that just because there is a prospective adoptive family that may be better suited to satisfy the Child's needs, such "does not mean that it is in the Child's best interest to be stripped of all contact with her." Appellant's Br. p. 16.

13

In determining what is in the best interest of a child, the juvenile court is required to look beyond the factors identified by the DCS and to consider the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the trial court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, we have previously held that the recommendations of the case manager and the CASA to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. In re J.S., 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

Here, in addition to the findings set forth above, the juvenile court determined that termination of Mother's parental rights is in the Child's best interests because the Child had been repeatedly transported back and forth between Mother's home and foster care placement since he was a year old. Appellant's App. p. 14. Additionally, it is certainly in the Child's best interest to grow up in a stable home that is free of drugs with no verbal or physical aggression. It was established that the Child's foster home was clean and free of maggots and roaches. There was also no stench of urine and excrement in the foster residence.

Also, during the termination hearing, Davidson testified that since the Child had been placed outside Mother's care, his diabetes was under control and the Child's behaviors have stabilized. Appellant's App. p. 14. Davidson acknowledged that the

Child is happy in his new environment. Even more compelling, the child requested in May 2012, that visits with Mother cease. Id.

Also, Lindsay Schilling, a child welfare specialist, Melissa Adamson, a community support case manager and Luann Horton, a therapist that provided individual therapy for the Child, testified that the Child has progressed tremendously and changed in a positive way with the help and support that he was getting from his foster parents. Tr. p. 14- 39. Horton specifically testified that Child will thrive in his new environment, because he will have parents who are steadily employed and who can provide him with the love and medical needs that he requires. Id. at 39.

Under these facts and circumstances, we conclude that the DCS proved by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest. As a result, we decline to set aside the termination order on this basis.

The judgment of the juvenile court is affirmed.

MAY, J., and MATHIAS, J., concur.