**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 29 2014, 10:39 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DANIEL L. ASKREN**
O'Connor and Askren Law Office
Attica, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General

**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE ) 
TERMINATION OF THE PARENT- ) 
CHILD RELATIONSHIP OF: ) 
       ) 
M.P. and E.P. (Minor Children), ) 
       ) 
  and ) 
       ) 
F.P. (Mother), ) 
       ) 
    Appellant-Respondent, ) 
       ) 
      vs. )   No. 23A01-1307-JT-308 
       ) 
THE INDIANA DEPARTMENT OF ) 
CHILD SERVICES, ) 
       ) 
    Appellee-Petitioner. )

APPEAL FROM THE FOUNTAIN CIRCUIT COURT
The Honorable Susan Orr Henderson, Judge
Cause Nos. 23C01-1302-JT-40 and 23C01-1302-JT-41

**January 29, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

In this termination of parental rights appeal, appellant-respondent, F.P. (Mother), challenges the decision of the juvenile court terminating her parental rights with regard to her two minor children, M.P., born on December 26, 2007, and E.P., born December 25, 2009 (collectively, "the Children"). Mother maintains that the appellee-petitioner, the Department of Child Services (DCS), presented insufficient evidence to show that there is a reasonable probability that the conditions that lead to the Children's removal and placement outside Mother's home are unlikely to be remedied, and that termination of Mother's parental rights is in the Children's best interest.

We conclude that the DCS established that there is a reasonable probability that the conditions that led to the removal are unlikely to be remedied, and that termination of Mother's parental rights is in the Children's best interests. Thus, we find that there was sufficient evidence to support the termination of Mother's parental rights, and we affirm the judgment of the juvenile court.

FACTS

Mother has five children born out of wedlock, with M.P. and E.P. being the subject of this appeal. On December 4, 2011, the DCS removed the Children and placed them together in a foster home after receiving reports that Mother was in the hospital for mental health treatment.[1] The two Children have the same father with paternity having been established but, at the time of the underlying December 6, 2011 Petitions Alleging Child in Need of Services (CHINS) that were filed on December 6, 2011, Mother was unsure about Father's whereabouts.

In November 2011, a worker at the shelter where Mother was living brought her to a mental health center in Crawfordsville because Mother was depressed and had suicidal ideations. Mother told one of the social workers at the facility that she had attempted to overdose on medication a few days earlier and "thought that she needed to be hospitalized for stabilization." Tr. p. 90. Mother was subsequently admitted to Riverbend Psychiatric Hospital in Lafayette, where she remained for nearly two weeks and received inpatient treatment.

On December 4, 2011, the DCS received a report regarding Mother's hospitalization at Riverbend. Various professionals had diagnosed Mother with major depression, panic disorder, and post-traumatic stress disorder. The report indicated that the Children were in the custody of their paternal grandparents, but they could no longer

---

[1] The DCS has previously substantiated reports of neglect regarding Mother and her older children in February and March, 2006.

care for them. As a result, one of the DCS caseworkers went to the grandparents' residence, removed the Children, and placed them together in a foster home.

The juvenile court issued an order on January 19, 2012, ordering Mother to participate in supervised visitation, complete a parenting assessment, undergo mental health treatment, find safe and secure housing, maintain income, and participate in various case conferences and case management services. Mother, who was pregnant, was also ordered to remain drug free and participate in regular prenatal care.

After Mother was hospitalized, her counselor, Keith Brehob, recommended weekly or biweekly therapy sessions. Mother missed many appointments, and, from November 2011 through February 2013, she attended approximately thirty sessions.

Although Mother's mood stabilized in April 2012, she showed an increase in stress and anxiety later that year. Mother did not attend therapy for the next three months because she felt uncomfortable discussing issues of sexual molestation with a male therapist. However, the mental health facility could have switched Mother to a female counselor.

Mother made very limited progress because of her inconsistent attendance, "repeated statements in the session that she did not know what to talk about," and "[came to therapy multiple times] stating she was tired and was finding it difficult to concentrate or work on some of the issues." Tr. p. 108-09.

Mother attended two parenting education class sessions and cancelled the three remaining classes. Mother's visitations with the Children started out well but were later

reduced because "there were a lot of cancellations." Id. at 149. Mother's behavior with the Children also regressed, and she had difficulty providing emotional support for the Children, especially M.P., who suffers from anxiety issues.

Mother provided random drug screens during the pendency of the proceedings and tested positive four times—three times for marijuana and once for Lortab. One of the positive marijuana screens occurred while Mother was pregnant with her youngest child. Although several medications were prescribed for Mother, she was unable to obtain them because she lost coverage under Medicaid and did not "consistently take them." Id. at 65, 125, 151.

Mother has resided in many places throughout the pendency of the proceedings. For instance, Mother moved in with her maternal grandmother for a short time, stayed with a friend for a while, and then lived with an aunt for about seven months. Although Mother eventually obtained an apartment and lived there for nearly six months, she was evicted because of "noise issues." Id. at 9. 41. Mother also stayed at a shelter in Crawfordsville for seventeen months. The average period of time for staying in a shelter is from six to eight months.

Mother has not maintained employment for more than a few months. Although Mother began working at Random House, she has not been able to save money for housing because of outstanding bills including child support payments, arrearages totaling $3000, and probation user fees. Either Mother's grandmother or the shelter provides her with transportation.

When the Children were placed in foster care in February 2012, they became more "relaxed" and developed "personalities." Tr. p. 191. M.P.'s anxiety issues decreased, and the DCS caseworkers determined that the Children are "very comfortable" at the foster home. Id. at 129. The foster parents are willing to adopt the Children, and they have not been returned to Mother's care since their removal.

The Court Appointed Special Advocate (CASA) was concerned about Mother's mental and physical wellbeing, her housing situation, employment issues, the fact that Mother placed her needs above the Children's, and her refusal to participate in mental health treatment. In light of these concerns, the CASA testified that the termination of Mother's parental rights was in the Children's best interests.

The DCS case manager agreed that termination was in the Children's best interests. More specifically, the case manager did not support reunification because Mother

> has a significant history of instability whether it's residential stability. She had not maintained housing. She's unable to maintain employment therefore she can't provide. Those are inconsistent. She gets assistance and then she loses assistance whether it's HUD housing, . . . Medicaid, [or] food stamps. Emotionally, she is not well herself or stable enough to provide emotional support for the boys. And then when she is upset and gets overwhelmed, she then sends them off some place until she is better herself, often separating them which was very traumatic each time for them.

Tr. p. 139-40.

On February 19, 2013, the DCS filed a petition for involuntary termination of parental rights. The juvenile court conducted an evidentiary hearing on the termination

6

petition on May 30, 2013, and took the matter under advisement. The juvenile court terminated Mother's parental rights as to the Children on June 6, 2013. It determined that the evidence presented at the termination hearing established that there is clear and convincing evidence that "a reasonable probability that the conditions that resulted in the removal of the Child[ren] from the home will not be remedied." Appellant's Br. p. 16. It also concluded that "termination is in the best interest of the Children." Mother now appeals.

## DISCUSSION AND DECISION

### I. Termination of Parental Rights—Standard of Review

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to raise their children. Troxel v. Granville, 530 U.S. 57, 65 (2000); Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). But parental rights are not absolute and must be subordinated to the child's interest in determining the proper disposition of a petition to terminate parental rights. In re D.D., 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004). Thus, "parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." Id. at 265. The purpose of terminating parental rights is not to punish parents but to protect their children. In re S.P.H., 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). The State has the authority under its parens patriae power to intervene when necessary to protect children. In re G.Y., 904 N.E.2d 1257, 1260 (Ind. 2009).

7

When reviewing the termination of parental rights, we neither reweigh the evidence nor judge the credibility of the witnesses. Id. at 1260. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment below. Id.

Here, the juvenile court made specific findings of fact and conclusions of law in its order terminating parental rights. Where the juvenile court enters specific findings and conclusions, we apply a two-tiered standard of review. Bester, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, and then whether the findings support the judgment. Id. We will not set aside the juvenile court's judgment unless it is clearly erroneous. In re A.A.C., 682 N.E.2d 542, 544 (Ind. Ct. App. 1997). A judgment is clearly erroneous when the evidence does not support the findings, or the findings do not support the result. See id.

The elements that the DCS must allege and prove by clear and convincing evidence to effect the termination of parental rights are set forth in Indiana Code section 31-35-2-4(b)(2), which provides:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

8

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2).

Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, which requires that only one of the sub-elements, under subsection (B), be proven true by clear and convincing evidence. In re L.S., 717 N.E.2d 204, 209 (Ind. Ct. App. 1999).

## II. Conditions Leading to Removal

Mother asserts that the termination order must be set aside because the DCS failed to adequately establish that the conditions resulting in the Children's removal would not be remedied. Mother contends that despite the fact that she was "not in the ideal position most would expect in life, the Court's ruling that [she] had not remedied the issues which lead to the removal of the children was clearly erroneous." Appellant's Br. p. 9.

When determining whether the conditions that led to a child's removal will not be remedied, the juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing. In re A.B., 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). However, the juvenile court's inquiry must also evaluate a parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id.

The juvenile court may properly consider a parent's history of neglect, criminal history, failure to provide support, lack of adequate housing, and lack of employment, among other things. McBride v. Monroe Cnty. OFC, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The juvenile court may also consider the services that the DCS has offered to a parent and the response to those services. In re M.S., 898 N.E.2d 307, 311 (Ind. Ct. App. 2008). The DCS is not required to rule out all possibilities of change; rather, it need establish "only that there is a reasonable probability that the parent's behavior will not change." In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Parental rights may be terminated when parties are unable or unwilling to meet their responsibilities. Ferbert v. Marion Cnty., OFC, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001). A parent's "future plans" are not evidence on which the juvenile court can base its opinion. In re B.D.J., 728 N.E.2d 195, 202 n.1 (Ind. Ct. App. 2000). In fact, a juvenile court can act within its discretion to disregard the efforts a parent made only shortly before termination and to weigh more heavily the parent's history of conduct prior to those efforts. In re K.T.K., 989 N.E.2d 1225, 1234 (Ind. 2013).

10

We first note that Mother admitted the allegations in the CHINS petitions, specifically, that the Children's physical or mental condition was seriously impaired or endangered as a result of her inability, refusal, or neglect to supply the Children with necessary food, clothing, or shelter. DCS Ex. 1.

As discussed above, Mother has failed to acquire permanent and stable housing as the juvenile court had ordered her to do. Rather, Mother has lived in a variety of places, including a shelter for seventeen months. The evidence showed that she had resided at that shelter longer than anyone had ever stayed in nearly three decades. Tr. p. 210.

Although Mother planned to rent an apartment, she was not able to receive HUD funds until 2014. Moreover, an apartment would not have been available for Mother until September or October 2013. In other words, at the time of the termination hearing, Mother did not possess housing that would provide permanency for the children. Rather, Mother had only potential or temporary housing such as what the shelter was providing. And the evidence established that Mother had not had stable housing since 2007.

Additionally, while Mother wanted to save money, she was unable to do so because of outstanding bills that included $3000 in child support arrearage. Mother also did not comply with the juvenile court's order to undergo mental health treatment and medication management through the facility in Crawfordsville. DCS Ex. 1. At the time of the CHINS petitions, the primary cause of Mother's inability to provide care for the Children arose from her mental health issues that caused her to be hospitalized in light of her suicidal ideations. Tr. p. 15, 43, 64, 85, 90, 99, 101.

11

Moreover, although Mother's counselor recommended weekly or biweekly therapy sessions, Mother attended only thirty appointments from November 2011 through February 2013. Id. at 87, 91-92. While some of these missed sessions were the result of Mother's physical health concerns, she stopped her therapy in February 2013 and did not receive treatment for nearly three months. Id. at 87. Although Mother may have been uncomfortable discussing issues of sexual abuse with a male therapist, she did not tell anyone of her concerns. Mother's therapist testified that he would have been able to accommodate Mother with a female counselor had she told him of her concerns.

Mother displayed a history of failing to participate in court-ordered services and was unwilling to modify her behavior to provide the Children with a safe and secure home. Mother's therapist testified that Mother only had "limited success with therapy for different reasons, and [her therapist was] not sure it [would] be worth [the] time and money to continue." Tr. p. 95-96. Such limited success was because of Mother's inconsistent attendance, "repeated statements in the session that she did not know what to talk about," and "somewhat understandable avoidance or reluctance to trust the process." Id. at 108-09.

Although Mother's depression stabilized somewhat in April 2012, she once again began to demonstrate increased stress and anxiety. Id. at 102-03, 105. Her mental health issues were a cause of her inability to provide care and shelter for the Children. During the CHINS case, Mother only had "limited success" in addressing those issues through

12

therapy. Id. at 95-96. Such limited success demonstrates that Mother is unlikely to remedy the conditions for the Children's continued removal from her care.

Similarly, Mother's continued substance abuse and her failure to complete parenting education classes provided an additional basis for the juvenile court to determine that the conditions that led to the Children's removal from her care would not be remedied. Mother tested positive for marijuana during one of her pregnancies and attended only two parenting education classes before cancelling the remaining sessions because "she did not feel that she needed parenting sessions." Id. at 31, 117. Mother also missed many visitations with the Children or cut them short. She also failed to re-schedule visitations or add additional ones when given the opportunity to do so.

In sum, it is apparent that the DCS, CASA, and the juvenile court, all made numerous attempts to facilitate the preservation of Mother's family by affording Mother several chances to remedy her conditions and by offering Mother exhaustive services that are designed to address her difficulties. Id.

Mother's failure to successfully complete the court-ordered services and programs demonstrates an unwillingness on her part to make lasting changes from past behaviors. Also, in twenty seven years, Mother has not maintained employment for more than a few months. Tr. p. 65-66. In our view, for the reasons discussed above, it is apparent that the DCS established that there is no reasonable probability that Mother will be able to maintain stability and remain substance free to care for the Children. In short, Mother

13

lacks the ability to meet her Children's needs. Thus, we decline to disturb the juvenile court's ruling on this basis.

### III.  Children's Best Interests

Mother challenges the juvenile court's conclusion that the termination of her parental rights was in her Children's best interest. Specifically, Mother argues that the termination order must be set aside because the CASA's testimony alone was not sufficient to justify the termination of her parental rights.

In determining what is in a child's best interest, the juvenile court is required to look beyond the factors identified by the DCS and to consider the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the trial court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, we have previously held that the recommendations of the case managers and the CASA to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. In re J.S., 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). Also, a parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children. Lang v. Starke Cnty. OFC, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007). Parental rights will be terminated when it is no

longer in the child's best interests to maintain the relationship. In re M.S., 898 N.E. 307, 311 (Ind. Ct. App. 2008).

Notwithstanding Mother's claims about the CASA, the DCS case manager testified that termination was in the best interests of the Children, and that she did not support reunification with Mother. And as discussed above, the DCS presented substantial evidence demonstrating the likelihood that Mother will not remedy the conditions leading to the removal of the Children, including her inability to secure stable housing and employment. Mother did not show improvement as a result of therapy, she continued to abuse substances, and she did not complete parenting education classes.

Additionally, the evidence demonstrated that the Children have thrived in their current foster placement. The Children's fears have decreased, they have developed "personalities," and M.P. has improved with regard to his anxiety issues. Tr. p. 158, 190, 192-94. The DCS case manager testified that the Children are "very comfortable . . . [and] feel at home. They feel loved." Id. at 129. The foster mother testified that she wanted to adopt the Children. Id. at 193.

On the other hand, the evidence demonstrated that Mother's visits with her Children "did not go well at all." Id. at 147. Mother could not maintain attention because of medication complications, and her "temper was very short." Id. As noted above, Mother cancelled some of the visits, failed to reschedule them, was late, and was "easily frustrated, where she would snap at the boys." Id. at 149-50.

15

Under these facts and circumstances, we conclude that the juvenile court properly found that the DCS proved by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest. As a result, we decline to set aside the termination order on this basis.

The judgment of the juvenile court is affirmed.

NAJAM, J., and CRONE, J., concur.