# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 09 2015, 7:17 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Deidre L. Monroe
Lake County Public Defender's Office
Gary, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF
CHILD SERVICES

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE CASA

Donald W. Wruck
Wruck Paupore PC
Dyer, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of C.K., Mother, J.E., Father, and A.K. and E.K., Children,

J.E.,

*Appellant-Respondent,*

v.

November 9, 2015

Court of Appeals Case No. 45A04-1503-JT-94

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Jr., Judge

| Indiana Department of Child Services, | Trial Court Cause Nos. |
| | 45D06-1408-JT-196 |
| *Appellee-Petitioner,* | 45D06-1408-JT-198 |
| | |
| Lake County Court Appointed Special Advocate, | |
| | |
| *Appellee.* | |

**Kirsch, Judge.**

J.E. ("Father") appeals the juvenile court's order terminating his parental rights to his children, A.K. and E.K. (collectively, "the Children"). He raises the following restated issue on appeal: whether the statutory elements for terminating Father's parental rights were established by clear and convincing evidence. Specifically, Father contends that the trial court was clearly erroneous in finding that (1) there is a reasonable probability the conditions that resulted in the Children's removal or the reasons for placement outside of the home will not be remedied; (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's wellbeing; and (3) termination is in the Children's best interest.

We affirm.

## Facts and Procedural History

[3] On February 22, 2013, E.K. was born at thirty-five weeks gestation weighing four pounds to C.K. ("Mother").[1] The Department of Child Services ("DCS") became involved with E.K. and A.K., E.K.'s then one-year-old sibling,[2] that same day, when the hospital contacted it to report that E.K. was born prematurely and addicted to drugs. Mother admitted to using methadone, heroine, and marijuana during her pregnancy. A urine screen returned a positive result for marijuana and methadone. A Family Case Manager ("FCM") from DCS investigated the hospital's report and learned that E.K. was in the Neonatal Intensive Care Unit ("NICU") receiving a morphine drip to treat the drug withdrawal symptoms. Additionally, other children had been removed from Mother's care in the past.

[4] DCS removed the Children without a court order on February 25, 2013 and initiated Child in Need of Services ("CHINS") proceedings. On February 26, 2013, DCS filed a CHINS petition based on its investigation, and a detention hearing was held that same day. The juvenile court subsequently ordered the Children's removal, and Mother and Father (collectively "the Parents") to participate in provisional services. Father was also ordered to establish paternity for the Children as he and Mother were never married. On April 29,

---

[1] C.K.'s parental rights were also terminated by the juvenile court, but she does not participate in this appeal. We, therefore, only recite facts pertaining to her as they relate to Father's case.

[2] Mother and Father each have other children; however, E.K. and A.K. are their only biological children together.

2013, after a CHINS fact-finding hearing, the juvenile court adjudicated the Children as CHINS retroactive to February 25, 2013. The Parents were ordered to participate in services geared towards reunification with the Children. The required services, which were similar to the provisional services, included a substance abuse evaluation, a clinical assessment to evaluate the Parents' mental health needs, a parenting assessment, ongoing drug screens, parenting classes, and home-based casework services. Additionally, Father was ordered to find and maintain suitable housing and employment. Although Father completed the clinical and substance abuse assessments, he failed to successfully complete the other required services.

Father failed to attend a review hearing[3] on May 12, 2014, and the juvenile court ordered that all services be stopped due to noncompliance of the Parents. Additionally, the juvenile court changed the permanency plan from reunification to termination of parental rights with adoption. On August 14, 2014, DCS filed a petition to terminate the parental rights of Mother and Father.

During the February 10, 2015 termination hearing, Father was evasive about his criminal history, but admitted that he had spent time in the Lake County and the Porter County Jails, that he had failed to successfully complete his probation and that he had spent time in the work release program.

---

[3] Father also failed to attend review hearings on July 24, 2013 and August 1, 2014.

[7] Service providers testified that Father did not make himself available for services on a consistent basis, that he was very inconsistent in his visitations with the Children, that they had a very difficult time contacting Father to arrange visits and that he often cancelled or failed to show up at the designated time and place and eventually stopped attending the visitations altogether. Father had an overall cancellation rate of eight-five percent.

[8] As for the home-based services, Father only met with the provider five times over a six-month period. Both Father and Mother struggled with unemployment and were living in an unsuitable home with "too many individuals living there." *Tr.* at 60. Father's FCM tried to help him find suitable housing and employment. Those efforts were unsuccessful, and on several occasions, Father indicated to the FCM that he did not need the services. Further, Father acknowledged at the termination hearing that he knew he needed to complete the services in order to have an opportunity to be reunited with the Children, but felt that the services were put in place "[f]or everyone to make money." *Id.* at 46. Moreover, it was unclear during the termination hearing where Father had been living throughout the course of the case plan.

[9] According to the testimony of the service providers, Father was in denial of his substance abuse problems and had tested positive for opiates on his drug screens. Father admitted to having had a problem with alcohol in the past and failed to comply with the weekly drug screens or participate in the recommended substance abuse counseling. When Father did submit to drug

screens, he was inconsistently clean or had abnormal levels of creatinine in his system. A service provider testified that abnormal levels of creatinine are common when individuals try to flush out or mask drugs in their system. The accumulation of these behaviors led the service providers to question Father's interest in staying drug free and his commitment to dealing with his other substance abuse issues for the sake of the Children.

Since the Children were removed by DCS on February 25, 2013, they have not returned to either of the Parents. The FCM testified that termination of parental rights is in the best interest of the Children. The Children have made great strides in their development, and they have bonded with their foster parents.

On February 11, 2015, the juvenile court issued its order terminating the parental rights of Father and Mother. Father now appeals.

## Discussion and Decision

We begin our review by acknowledging that this court has a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id*. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the

court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

[13] In the present case, the juvenile court entered specific findings of fact and conclusions when it terminated Father's parental rights to the Children. We apply a two-tiered standard of review when the trial court's judgment contains specific findings and conclusions. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. We will only conclude that the trial court's findings are clearly erroneous if "the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). Accordingly, we must affirm if the evidence and inferences support the trial court's decision. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

[14] The right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013). "The parent-child relationship is one of our culture's most valued relationships." *Id*. Parental rights are not absolute and must be subordinated to the children's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). Moreover, although the right to raise one's own children should not be terminated solely because there is a better home for the

children, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[15] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for the placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (C) that the termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[16] Father argues that DCS failed to prove the required elements for termination of parental rights by sufficient evidence. Specifically, he contends that DCS failed to present clear and convincing evidence that the conditions that resulted in the removal or the reasons for placement outside of the home would not be remedied.

[17] In determining whether there is a reasonable probability that the conditions that led to the children's removal and continued placement outside the home would be remedied, the trial court engages in a two-step analysis. *In re K.T.K.*, 989 N.E.2d at 1231. First, it "must ascertain what conditions led to their placement and retention in foster care." *Id.* Second, "it must determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (citing *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). The court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.2d 636, 643 (Ind. 2014) (quoting *In re K.T.K.*, 989 N.E.2d at 1231). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that parents' past behavior is the best predictor of their future behavior. *Id.*

[18]     Here, the evidence showed that, in February 2013, the Children were removed from the Parents due to a report that E.K. was born prematurely and tested positive for drugs at birth. Mother admitted to using methadone, heroin, and marijuana during her pregnancy. Mother and Father were together at the time of the removal, and Father was aware of Mother's drug use during her pregnancy. E.K. was in the NICU for some time after his birth due to complications from being premature and addicted to drugs. A.K. was placed outside the home with an aunt. The Children were later adjudicated as CHINS, and the Parents were ordered to not use illegal substances and submit to drug screens; participate in supervised visitation; complete separate parenting, clinical, and substance abuse assessments and follow all recommendations; complete parenting classes; maintain suitable housing and employment; and participate in case management services. The Children continued to be placed outside the home for almost two years after they were removed in February 2013. During that two-year period, extensive services were offered the Parents to help them reunite with the Children, address their substance abuse issues, and maintain safe and suitable housing. The trial court concluded that the services were ineffective due to the Parents' non-compliance.

[19]     Father has a criminal record, had his probation revoked in the past, and was incarcerated on a probation violation as recently as November 2014. Father was inconsistent in participating in the court-ordered services, did not show up for several review hearings and frequently missed his visitations with the Children. Father attended only five of the weekly home-based service meetings

over a six-month period. Father repeatedly refused to submit to drug screens or was unavailable when service providers attempted to contact him. When Father did consent to the drug screens, he had several positive and abnormal results indicating that he either had drugs in his system or may have attempted to flush out his system. He also refused to participate in the recommended substance abuse counseling.

[20] The juvenile court was presented with evidence that Father was non-compliant with those providing services, has a pattern of criminal history, missed a significant amount of visitations with the Children, was aware of Mother's drug use during her pregnancy, and showed signs of substance abuse. Based on the evidence presented, we conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal of and the reasons for continued placement of the Children outside the home will not be remedied.

[21] Father argues that DCS failed to present sufficient evidence that the continuation of the parent-child relationship poses a threat to the Children. However, we need not address such argument because Indiana Code section 31-35-2-4(b)(2)(B) provides that the State must allege and prove by clear and convincing evidence one of the three requirements of subsection (b)(2)(B). *A.D.S.*, 987 N.E.2d at 1155-56. Having determined that sufficient evidence supported the juvenile court's conclusion that the conditions that resulted in the removal of the Children would not be remedied, we do not address whether

sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of the Children.

[22] Father next argues that insufficient evidence was presented to prove that termination is in the best interests of the Children. In determining what is in the best interests of the Children, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.*, 804 N.E.2d at 267), *trans. dismissed*. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper when the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* The trial court may also consider the services offered as well as the parents' response to those services. *Id.* If the parents are unable or unwilling to effectively use the services recommended to them to properly care for their child, it may no longer be in the child's best interests to maintain the relationship. *In re M.S.*, 898 N.E.2d 307, 312 (Ind. Ct. App. 2008) (citing *Febert v. Marion Cnty. Office of Family & Children*, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001)). Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's

best interests. *In re A.K.*, 924 N.E.2d at 224 (citing *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

[23] E.K. has never lived with Father, and it is unclear how much time A.K. actually spent in Father's care prior to the removal. According to the evidence, A.K. was cared for by her aunt "off and on since the child was 2 weeks old." *State's Ex.* J at 3. The Children are still very young and are at very critical points in their development. A.K. and E.K. have and will continue to struggle with various problems due to their past which require special attention. To ensure that they continue to develop, the Children need a safe, stable drug-free home and environment. "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d at 1265. Father's inconsistencies and lack of commitment to completing the court-ordered services are indicative of the fact that he is unable to provide the necessary stability that the Children require and deserve. The evidence showed that the Children's needs are being met by their current foster parents, the Aldrins, who wish to adopt them. Additionally, the FCM testified that adoption by the Aldrins is in the best interests of the Children because "the home they're in right now is safe and stable, and the kids already have fun with the family." *Tr.* at 103. Based on the above evidence, we conclude that sufficient evidence was presented to prove that termination was in the best interests of the Children. The juvenile court's order was supported by clear and convincing evidence, and there was no error in terminating Father's parental rights.

[24] Affirmed.

Najam, J., and Barnes, J., concur.