## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 26 2017, 8:27 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Victoria L. Bailey
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Aaron T. Craft
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re Termination of the Parent-Child Relationship of: J.T., Dt.W., and Dc.W. (Minor Children),
and
T.D. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

and

September 26, 2017

Court of Appeals Case No.
49A02-1704-JT-671

Appeal from the Marion Superior Court

The Honorable A. Marilyn Moores, Judge
The Honorable Larry E. Bradley, Magistrate

Trial Court Cause Nos.
49D09-1511-JT-672
49D09-1511-JT-673
49D09-1511-JT-674

Child Advocates, Inc.,

*Appellee-Guardian ad Litem.*

**Bradford, Judge.**

# Case Summary

[1] Appellant-Respondent T.D. ("Mother") appeals the juvenile court's order terminating her parental rights to Dc.W. and Dt.W. She raises the following restated issue on appeal: whether the Department of Child Services ("DCS") presented sufficient evidence to support the termination of her parental rights to Dt.W. and Dc.W. Specifically, Mother contends that the juvenile court erroneously found that termination was in Dc.W.'s and Dt.W's best interests. Concluding that the evidence is sufficient to support the termination order, we affirm.

# Discussion and Decision

[2] Mother is the biological parent of Dc.W., who was born November 4, 2011, Dt.W., who was born June 22, 2010, and J.T., who was born on July 28, 2006.[1] On January 17, 2012, DCS filed a verified petition alleging Dc.W., then a two-

---

[1] Mother does not appeal the termination of her parental rights with respect to J.T. The children have different biological fathers. The parental rights of the fathers were also terminated, but they do not participate in this appeal.

month-old child with special needs, to be a child in need of services ("CHINS") due to medical neglect. An initial hearing was held that day, and Dc.W. was initially permitted to remain in the home.

[3] On January 26, 2012, the juvenile court issued an order removing Dc.W. from the home and placing him into foster care. That same day, DCS filed a verified petition alleging that J.T. and Dt.W., Dc.W.'s older brothers, were CHINS. The juvenile court held an initial hearing that day and ordered that Dt.W. and J.T. also be placed in foster care.

[4] On February 21, 2012, the juvenile court found that the children were CHINS based on Mother's admission. A dispositional hearing for Mother was held the same day. Dc.W.'s father agreed with Mother's admission but asked that the disposition be set a few weeks later after he established paternity. His dispositional hearing was held on March 5, 2012.

[5] On May 1, 2012, the juvenile court held a periodic review hearing—Dc.W.'s father did not attend because he was in jail for physically assaulting Mother. On November 13, 2012, the court held the first permanency hearing. DCS recommended that the permanency plan remain reunification in view of the parents' progress up to that point, and the juvenile court agreed.

[6] On February 19, 2013, a periodic review hearing was held. Mother did attend the hearing, but she was not actively engaging in services or visiting the children at that time because she had moved to Michigan in November of 2012 with Dc.W.'s father.

[7] A second permanency hearing was held on May 28, 2013. DCS recommended that the permanency hearing plan be changed to adoption and the guardian ad litem ("GAL") agreed. At that point, the parents had not completed services, Mother had not seen the children since her November 2012 move to Michigan, and the children were doing very well in their foster care placement. DCS initiated termination proceedings with respect to all three children in June 2013.[2]

[8] By the time of the September 10, 2013, periodic review hearing, Mother and Dc.W.'s father had returned to Indianapolis and were engaging in services. In January of 2014, DCS dismissed the original termination proceedings due to Mother's and Dc.W.'s father's cooperation and compliance with services.

[9] On April 8, 2014, the juvenile court held another permanency hearing. The permanency plan was changed back to reunification, over the GAL's objection. On September 16, 2014, the juvenile court issued a no-contact order barring contact between Mother and Dc.W.'s father and between Dc.W.'s father and the children, because he had attacked Mother.[3]

[10] On April 17, 2015, the GAL filed a motion to suspend Mother's unsupervised visitation with the children after Mother was seen with Dc.W.'s father in

---

[2] Mother has at least one other biological child who is not a part of this particular case.

[3] There is also evidence in the record that Dc.W.'s father abused J.T. causing him to suffer from post-traumatic stress disorder, reactive attachment disorder, and other severe behavioral issues.

violation of the no-contact order. DCS objected to the motion because it wanted to give Mother another chance due to all the progress she had made on other fronts. On April 28, 2015, the juvenile court denied the GAL's motion.

[11] On September 1, 2015, the juvenile court held a permanency hearing. Mother and Dc.W.'s father came to the hearing together despite the no-contact order. Several days before the hearing, Dc.W.'s father violated the no-contact order when he was present in Mother's home during an unsupervised visit intended to be between Mother and the children. The juvenile court ordered that Mother's visits be fully supervised due to concerns about Mother not being able to keep the children safe.

[12] During an October 6, 2015, permanency hearing, the juvenile court changed the permanency plan from reunification back to adoption. The juvenile court noted that the matter had been open since January 2012 and Mother had not successfully completed services. While Mother had participated in some services, she had not demonstrated a willingness or an ability to protect her children from their abuser, allowing Dc.W.'s father to have contact in violation of the no-contact order.

[13] On November 5, 2015, DCS filed a petition for involuntary termination of parental rights with respect to Mother and all three children, Dc.W. and his father, and Dt.W. and his biological father.[4] A four-day trial was held on

---

[4] The parent-child relationship between J.T. Sr., and J.T. had been severed on October 24, 2013.

August 22 and 23, 2016, and February 21 and 22, 2017. Mother attended the first day of trial via telephone and the second day of trial in person. Mother, however, did not attend the last two days of trial. Dc.W.'s father attended only part of the first day of trial via telephone.

[14] On March 9, 2017, the juvenile court issued an order terminating the parent-child relationships between Mother and all three children, Dc.W. and his father, and Dt.W. and his father. In doing so, the juvenile court made the following pertinent specific findings:

> 44. The three children have been placed with the same foster parents since January of 2012, and this placement is preadoptive.
>
> 45. [Dt.W. and Dc.W.] were seeing a behavior specialist from April of 2016, due to difficulties with severe temper outbursts and tantrums.
>
> 46. [Dt.W] is cognitively struggling in school and is speech delayed. He has an Individualized Educational Program set up for him at school and he has an academic aide. He is on three medications.
>
> 47. [Dc.W.] was a failure to thrive baby but his foster parents caught his weight up in a month. He sees six doctors and has two medications presented for his behavior issues. [5]

_____

[5] Dc.W. weighed four to five pounds when he was removed from the home at two-months old. He was also very sick. The foster parents had to take him to approximately twelve doctors during the first three months that he was in their home to help get him to a normal weight and improve his health.

****

58. The children's caregivers work with providers and they follow the same behavior program from school to provide structure, stability, and predictability.

59. The foster parents are advocates toward meeting the children's intense special needs.

60. The children have been observed as being very bonded to their preadoptive foster parents. [J.T.] has been placed with the family one-half of his life, and [Dt.W.] and [Dc.W.] for most of their lives.

61. Continuation of the parent-child relationship poses a threat to the children's well-being. It would stand as a barrier to having the children adopted, after five years of being wards, into the home where they have bonded and are having all their needs met. If placed back with their mother, it is not known if she would be able to provide for the children's basic or special needs on a twenty-four seven basis, or provide the stability the children must have.

62. Without continued structure and stability, the children's behaviors could regress.

63. There is a reasonable probability that the conditions that resulted in the removal and continued placement of the children outside the home will not be remedied by their mother. Although [Mother] made good progress in services until the end of 2015, it is clear that she was not willing to give up her relationship with [Dc.W.'s father] and provide a safe environment, emotionally and physically, in which to appropriately parent.

****

66. Family Case Manager Phyllis Clemons has been on the CHINS case for four years. She recommends adoption given the five-year length of the CHINS case, and the children thriving, and being bonded, in their placement which is nurturing and loving.

67. Mark Bass has been the children's Guardian ad Litem since the CHINS opened. He agrees with the plan of adoption as being in the children's best interests given the children's bond and having their special needs met.

68. Termination of the parent-child relationship is in the best interests of the children. Termination would allow them to be adopted into a stable and permanent home in which they have resided for much of their lives, and where their basic and special needs will continue to be safely met.

69. There exists a satisfactory plan for the future care and treatment of the children, that being adoption

Appellant's App. Vol. II pp. 59-60.

# Discussion and Decision

[15] This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will consider only the evidence and reasonable inferences that are most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App.

2004), *trans. denied*. Thus, we will not reweigh the evidence or judge the credibility of the witnesses. *Id*. We will only set aside the court judgment terminating a parent-child relationship if it is clearly erroneous. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008).

[16] The traditional right of a parent to establish a home and raise her children is protected by the Fourteenth Amendment to the United States Constitution. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Furthermore, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, parental rights are not absolute and the law allows for the termination of such rights when a parent is unable or unwilling to meet her responsibilities as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans denied*. The purpose of terminating parental rights is to protect the child, not to punish the parent. *Id*. The juvenile court may terminate the parental rights if the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child has suffered from irreversible harm. *Id*.

[17] Before an involuntary termination of parental rights may occur, DCS is required to prove by clear and convincing evidence that:

> (A) one (1) of the following exists:
>
>> (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
>>
>> (ii) a court has entered a finding under IC 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required, including a description of

the court's finding, the date of the finding, and the manner in which the finding was made; or

    (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

    (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS's burden of proof for establishing these allegations in a termination case is one of "clear and convincing evidence." *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009).

[18] Mother argues that the juvenile court's order terminating the parental rights as to Dc.W. and Dt.W. was clearly erroneous. Specifically, Mother argues that the findings of facts do not support its conclusion that termination is in the children's best interests.

[19] Mother argues that the juvenile court's conclusion that termination is in Dc.W.'s and Dt.W.'s best interests is "mere speculation." Appellant's Br. p. 14. When reviewing such claims, we are mindful of the fact that the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the circumstances. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, this court must subordinate the interest of the parent of the child involved. *Id*. Children's need for permanency is a "central consideration in determining the [children's] best interests." *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1235 (Ind. 2013). Further, the Indiana Supreme Court has acknowledged that "children cannot wait indefinitely for their parents to work toward preservation or reunification—and courts 'need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship.'" *In re E.M.*, 4 N.E.3d 636, 648 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1235).

[20] In addressing whether termination was in Dt.W's and Dc.W.'s best interests, we note that the DCS Family Case Manager and the GAL testified that termination was in their best interests. Such testimony is sufficient to support the juvenile court's conclusion in this regard. *See In re A.B.*, 887 N.E.2d 158, 170 (Ind. Ct. App. 2008). However, additional evidence further supports the juvenile court's conclusion. Dc.W. and Dt.W. have been in foster care for more than five and a half years. Mother has failed to maintain a consistent and

positive relationship with Dc.W. and Dt.W. throughout the CHINS case. She has not visited them since December of 2015. There was also a period from November 2012 to May 2013 where she moved to Michigan. Furthermore, the record shows that Mother consistently put her relationship with Dc.W.'s father ahead of the health and safety of her own children.

[21] The service providers further testified that the children would be seriously endangered in Mother's care despite all of their efforts to help Mother with reunification. The record shows that Mother's relationship with Dc.W.'s father was often a priority over the needs and safety of her children. These findings indicate Mother is uninterested or unwilling to put her children's needs and safety first.

[22] Moreover, establishing permanency for Dc.W. and Dt.W. was repeatedly expressed as a reason for termination given their special needs. Dc.W. and Dt.W. both have severe behavioral issues and have been seeing a behavior specialist since April 2016. Dc.W. has a "terrible temper" and will head-butt and pinch to the point that he cannot be controlled. Tr. Vol. III p. 101. When they started seeing the behavior specialist, Dc.W. and Dt.W. would not listen and would throw severe temper tantrums. Dt.W. was struggling with the same aggressive behaviors at school, striking teachers and peers when he got angry. Their development is delayed and they behavior is consistent with that of a younger child. The foster parents and specialist worked together at home and at school to provide the children with structure, consistency, and predictability. Dt.W. and Dc.W. have shown considerable improvement due to those efforts.

However, the behavior specialist testified that if the stability, consistency, security, and predictability is taken away, it is likely that they behaviors will regress and the aggression and defiance will return. The record contains clear and convincing evidence that Mother is not capable of providing Dt.W. and Dc.W. with the care they need to have a safe and stable life.

[23] The totality of the evidence demonstrates that the juvenile court's conclusion that termination of Mother's parental rights is in Dc.W.'s and Dt.W.'s best interests is not clearly erroneous. *See, e.g.*, *In re T.F.*, 743 N.E.2d 776 (Ind. Ct. App. 2001) (holding that the record contained sufficient evidence that termination of the parents' rights was in the best interests of the children). Consequently, we find sufficient evidence in the record to support the juvenile court's conclusion that DCS proved the statutory elements by clear and convincing evidence. Mother is essentially asking us to reweigh the evidence as it pertains to the children's best interests, which we will not do. *In re N.G.*, 51 N.E.3d 1167, 1170 (Ind. 2016).

[24] For the foregoing reasons, we affirm the juvenile court's termination of Mother's parental rights to Dc.W. and Dt.W.

May, J., and Barnes, J., concur.